[No. D051015. Fourth Dist., Div. One. Jan. 21, 2009.]

In re DAVID VASQUEZ on Habeas Corpus.

372

---

## COUNSEL

Rich Pfeiffer, under appointment by the Court of Appeal, for Petitioner David Vasquez.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Linnea D. Piazza, Deputy Attorney General, for Respondent the State of California.

---

## OPINION

**McINTYRE, J.**—David Vasquez challenges Governor Arnold Schwarzenegger's reversal of a decision by the Board of Parole Hearings (the Board) finding him suitable for release on parole. We conclude there was no evidence to support the Governor's ultimate conclusion that Vasquez was unsuitable for parole because he currently posed an unreasonable risk to public safety. Accordingly, we grant Vasquez's petition for a writ of habeas corpus and reinstate the Board's parole release order.

## I. FACTS

### A. *The Offense*

The facts of Vasquez's offense, as derived from our earlier appellate decision (*People v. Vasquez* (May 12, 1994, D016853) [nonpub. opn.]), are as follows:

Maria Roth and the victim, Miguel Alarcon, were involved in a volatile romantic relationship and lived together for nine years. In September 1990, the couple had a fight and Alarcon eventually moved out of Roth's apartment two months later. Meanwhile, Roth started seeing Vasquez and agreed to become his girlfriend.

In November 1990, Alarcon became angry after discovering that Roth was Vasquez's girlfriend and told Roth he would "take a bat and beat the fuck out of [Vasquez]." Alarcon later confronted Vasquez and beat him up, causing Vasquez two black eyes and a swollen nose as well as a broken right wrist. Vasquez tried to avoid Alarcon by staying at his brother's house, but his car was broken into, rigged so that it would not start and items (later found in Alarcon's garage) were taken. Vasquez and Roth then moved to his sister's house, which Vasquez believed Alarcon would not be able to find.

Roth warned Vasquez that Alarcon was crazy enough to go after him and that he tended to get violent when he was drunk or on drugs. Roth related one incident in which Alarcon had been caught by the police with a rifle when he had been getting ready to hurt someone because of jealousy. The warnings scared Vasquez, who obtained a .22-caliber derringer from a friend, but later returned it. During December 1990, Roth met with Alarcon and had sex with him twice, but by New Year's Eve, she was back with Vasquez. On January 1, 1991, Alarcon stole Roth's car and later agreed to return it after Roth again stated she would not see Vasquez any more.

Five days later, Alarcon confronted Roth about her relationship with Vasquez and told her he would see her and Vasquez later that night and shoot them. After Roth told Vasquez what Alarcon had said about shooting them, they drove to a friend's house and borrowed a two-shot derringer. When Alarcon later found the couple, Vasquez had Roth get out of the car to hide and then drove off.

Alarcon drove after Vasquez and rear-ended Vasquez's car. Vasquez stopped, got out and started pacing in front of his car. Alarcon also stopped and Vasquez went to the driver's side door of his car. As Alarcon opened the door and started to get out, Vasquez fired his gun. A few seconds after Alarcon got out of the car, Vasquez fired a second shot and the men immediately started fighting. At some point, Alarcon stopped fighting, but Vasquez continued to hit and kick him.

Alarcon died from a gunshot wound to his chest and suffered another wound from a bullet that was fired into his side at a downward 40 degree angle. Alarcon's blood and urine had traces of methamphetamine and a 0.20 blood-alcohol content at the time of his death.

After the shooting, Vasquez left town, but returned a few days later and voluntarily went to the police station, waived his *Miranda* rights and gave a tape-recorded interview. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].) During the interview, Vasquez recounted his fight with Alarcon in November and the ensuing harassment. As to the fatal confrontation, Vasquez claimed that Alarcon was holding a gun as Alarcon got out of the car and that he knocked it out of Alarcon's hand. Vasquez then picked up the gun and pointed it at Alarcon as Alarcon advanced towards him. Vasquez told Alarcon to stop, but Alarcon continued to advance. Vasquez said he fired one shot as he backed away but Alarcon was still moving toward him. Vasquez then fired the second shot. Vasquez claimed that Alarcon knocked

the gun out of his hand and they fought until Alarcon slumped down. The police did not arrest Vasquez.

Four months later, Roth contacted the police after quarreling with Vasquez and told a detective that she learned Vasquez had not shot Alarcon in self-defense, but had murdered him. The police arrested Vasquez in September 1991.

## B. *The Trial and Appeal*

At trial, Vasquez claimed he was attempting to leave the area to avoid Alarcon when Alarcon rear-ended Roth's car. Vasquez parked the car and got out to look at the damage when Alarcon pulled up behind him. Vasquez claimed that after Alarcon opened the door and put his left foot out, Vasquez took the gun out of his pocket, pointed it at Alarcon through the window and told Alarcon to stay in his car and leave him alone. Alarcon then swung the car door open and the gun "just went off." Vasquez claimed that he reflexively fired a second shot as Alarcon rushed towards him, but that the second shot had no apparent effect on Alarcon. The men fought until Alarcon slumped down.

A jury convicted Vasquez of second degree murder and found that he had personally used a firearm. The probation report noted that the crime may have been committed out of great provocation because Alarcon had continually forced confrontations with Vasquez and that Alarcon's family had forgiven Vasquez and did not believe he should go to prison. The probation officer indicated he had no alternative but to recommend a 15-year-to-life prison term for the murder, plus an additional three years for the firearm use. The trial court followed this recommendation and we affirmed the judgment on appeal.

## C. *Vasquez's Performance in Prison*

Since entering prison in 1992, Vasquez was disciplined four times in 1998 for violating grooming standards and counseled two times that year for less serious misconduct. Vasquez attended adult literacy classes, worked to obtain his GED and availed himself of an array of self-help and therapy. Vasquez also received vocational training in auto painting, received a certificate in food service and held 11 different institutional jobs. A prison staff member noted that Vasquez was an "exceptional worker" and "would be a productive member of society if given a second chance." Another staff member indicated

that Vasquez was "competent and eager to take on new tasks" and demonstrated maturity. Vasquez has maintained contact with his mother and others over the years and made postrelease plans to live with his mother and work nearby.

## D. The Present Proceedings

The present parole hearing was conducted in 2006 and the Board concluded that Vasquez was suitable for parole and would not pose an unreasonable risk of danger to society if released from prison. After citing Vasquez's positive prison behavior, the Board noted that Vasquez had committed the offense as a result of "significant stress" in his life after suffering from the victim's harassment, intimidation and assault. The Board believed that Vasquez was more mature now that he was 43 years old and that his prison misconduct related to a ponytail he wore as a Native American and that such behavior was no longer considered a disciplinary matter.

On August 3, 2006, the Governor reversed the Board's parole grant because he believed that Vasquez posed an unreasonable risk of danger to society and that the gravity of the murder outweighed any positive factors supporting parole suitability. The Governor concluded that the murder involved some level of premeditation, that Vasquez demonstrated exceptionally callous disregard for human suffering when he continued to hit and kick Alarcon after Alarcon stopped fighting and that any stress he was under, given the nature and circumstances of the murder, did not tip the scales in favor of parole suitability.

Vasquez petitioned the San Diego County Superior Court for a writ of habeas corpus, alleging that the Governor's decision was arbitrary and capricious. The court denied the writ, concluding the Governor's decision was supported by some evidence. Vasquez filed a writ petition in this court and we issued an order to show cause why the relief requested should not be granted.

In an unpublished decision, we concluded the Governor's denial of parole was not supported by the record and granted Vasquez's petition. (*In re Vasquez* (Apr. 18, 2008, D051015) [nonpub. opn.].) The Supreme Court granted the People's petition for review, but deferred further action on this case pending its disposition of a related issue in *In re Lawrence* (2007) 150 Cal.App.4th 1511 [59 Cal.Rptr.3d 537], review granted September 19, 2007,

S154018; *In re Shaputis* (Aug. 21, 2007, D049895) (nonpub. opn.), review granted October 24, 2007, S155872; and *In re Jacobson* (2007) 154 Cal.App.4th 849 [65 Cal.Rptr.3d 222], review granted December 12, 2007, S156416. (*In re Vasquez,* review granted July 30, 2008, S163931.)

■ Our high court then issued two decisions, *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*) and *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*), clarifying the appropriate standard for reviewing a parole decision of either the Board or the Governor. The court transferred the matter back to this court with directions to vacate our earlier decision and reconsider the matter in light of *Lawrence* and *Shaputis.* Having reconsidered the matter as directed, we again conclude that some evidence did not support the Governor's decision to reverse the Board's grant of parole. Accordingly, we grant Vasquez's petition for habeas corpus relief and reinstate the Board's grant of parole.

## II. DISCUSSION

### A. *The Statutory Framework and Judicial Review*

■ The purpose of parole is to "help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed." (*Morrissey v. Brewer* (1972) 408 U.S. 471, 477 [33 L.Ed.2d 484, 92 S.Ct. 2593].) Although parolees are no longer in physical custody, they remain under the legal custody of the Department of Corrections and Rehabilitation and can be returned to prison at any time. (Pen. Code, § 3056; *People v. Denne* (1956) 141 Cal.App.2d 499, 508 [297 P.2d 451] [parolees are permitted to serve the remainder of their term outside rather than within prison walls].) Parolees are also subject to conditions that govern their residence, associates, ability to travel, use of intoxicants and other aspects of their lives. (Cal. Code Regs., tit. 15, §§ 2512–2513.)

■ The granting of parole is an essential part of our criminal justice system and is intended to assist those convicted of crime to integrate into society as constructive individuals *as soon as possible* and alleviate the cost of maintaining them in custodial facilities. (*Morrissey v. Brewer, supra,* 408 U.S. at p. 477; *People v. Vickers* (1972) 8 Cal.3d 451, 455, 458 [105 Cal.Rptr. 305, 503 P.2d 1313].) Release on parole is said to be the rule, rather

than the exception (*In re Smith* (2003) 114 Cal.App.4th 343, 351 [7 Cal.Rptr.3d 655], citing Pen. Code, § 3041, subd. (a)) and the Board is required to set a release date unless it determines that "the gravity of the current convicted offense . . . is such that consideration of the public safety requires a more lengthy period of incarceration . . . ." (Pen. Code, § 3041, subd. (b).)

■ In determining whether an inmate is suitable for parole, the Board and the Governor must consider certain factors tending to show suitability and unsuitability for parole. (Cal. Const., art. V, § 8, subd. (b); Pen. Code, § 3041.2.) The specified factors are "general guidelines" (Cal. Code Regs., tit. 15, § 2402, subds. (c), (d)) and the Board is expected to consider "[a]ll relevant, reliable information available" because circumstances taken alone, while not establishing unsuitability for parole, may contribute to a pattern which results in a finding of unsuitability. (*Id.*, subd. (b).)

■ Circumstances tending to show suitability for parole include that the inmate (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress had built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that suggest an enhanced ability to function within the law upon release. (Cal. Code Regs., tit. 15, § 2402, subd. (d).)

■ A prisoner may be considered unsuitable for parole based on six nonexclusive factors, including: (1) the nature of the commitment offense; (2) a previous record of violence; (3) an unstable social history; (4) a record of sadistic sexual offenses; (5) psychological factors; and (6) serious prison misconduct. (Cal. Code Regs., tit. 15, § 2402, subd. (c).) The only factor at issue in this case is the nature of Vasquez's offense, specifically, whether it was committed in an "especially heinous, atrocious or cruel manner." (*Id.*, subd. (c)(1).) ■ Some aspects of the crime to consider in deciding this particular factor include whether (1) there were multiple victims; (2) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (3) he abused, defiled or mutilated the victim during or after the offense; (4) he carried out the offense in a manner demonstrating an exceptionally callous disregard for human suffering; and (5) the motive for the crime was inexplicable or very trivial in relation to the offense. (*Ibid.*)

■ The Governor has the authority to review the Board's decision to parole an inmate convicted of murder. (Cal. Const., art. V, § 8, subd. (b); Pen.

Code, § 3041.2.) The Governor's decision to reverse a grant of parole by the Board is governed by the same factors that guide the Board's decision (Cal. Const., art. V, § 8, subd. (b)), and is based on "materials provided by the parole authority." (Pen. Code, § 3041.2, subd. (a).) The judicial branch is authorized to review the factual basis of the Governor's decision. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).) Although due process requires that the Governor's decision be supported by "some evidence" in the record, only a modicum of evidence is required and the Governor has the authority to resolve any conflicts in the evidence and to decide the weight to be given the evidence. (*Id.* at p. 677.)

■ "[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

■ Although the nature of the prisoner's offense, standing alone, may be a sufficient basis to deny parole, "[i]n some circumstances, a denial of parole *based upon the nature of the offense alone* might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (*Rosenkrantz, supra*, 29 Cal.4th at p. 683, italics added.) Accordingly, a life term offense must be " 'particularly egregious to justify the denial of a parole date.' [Citation.]" (*Ibid.*)

■ In *In re Dannenberg* (2005) 34 Cal.4th 1061, 1071 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*), our high court explained that its "use of the phrase 'particularly egregious,' conveyed only that the violence or viciousness of the inmate's crime must be more than minimally necessary to convict him of the offense for which he is confined. [Citation.]" (*Id.* at p. 1095, italics omitted.) The *Dannenberg* court also emphasized that "the determination of suitability for parole involves a paramount assessment of the public safety risk posed by the particular offender, without regard to a comparative analysis of similar offenses committed by other persons." (*Id.* at p. 1084.) Stated differently, "the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, [but] it

need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." (*Id.* at p. 1071.) In the case before it, the *Dannenberg* court concluded that the Board had proceeded lawfully when it found the inmate unsuitable for release because it had pointed to some evidence that the particular circumstances of the crime, circumstances beyond the minimum elements of the conviction, indicated exceptional callousness and cruelty with trivial provocation and suggested the inmate remained a danger to public safety. (*Id.* at p. 1098.)

■ In our prior opinion, we concluded that the appropriate inquiry was not whether there is some evidence to support the individual suitability or unsuitability factors, but whether there is some evidence supporting the ultimate decision that the prisoner will pose an unreasonable risk of danger to society if released from prison. (*In re Vasquez, supra,* D051015, citing *Rosenkrantz, supra,* 29 Cal.4th at p. 664 [the Governor's decision is subject to judicial review to ensure due process compliance]; Cal. Code Regs., tit. 15, § 2402, subd. (a) [an unsuitability decision is a conclusion that "the prisoner will pose an unreasonable risk of danger to society if released from prison"].) We also noted that it was appropriate to consider the nature of the crime as this had a bearing on whether the individual was likely to reoffend and thereby pose a risk to society if released. (*In re Vasquez, supra,* D051015.)

(In her dissenting opinion, Justice Haller disagreed with the standard of review articulated in the majority opinion and concluded there was some evidence to support the Governor's conclusion that Vasquez's crime was particularly egregious because the circumstances of the crime went beyond the minimum necessary to sustain a conviction for the underlying crime. (*In re Vasquez, supra,* D051015 (dis. opn. of Haller, J.).))

■ In *Lawrence* and *Shaputis,* our Supreme Court confirmed that we used the correct standard in our prior opinion. (*Lawrence, supra,* 44 Cal.4th at p. 1212 ["It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public."]; *Shaputis, supra,* 44 Cal.4th at p. 1254.) "[T]he aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Lawrence, supra,* at p. 1214, original italics.) Accordingly, we independently review the record

(*Rosenkrantz, supra*, 29 Cal.4th at p. 677) to determine "whether the identified facts are probative to the central issue of current dangerousness when considered in light of the full record before . . . the Governor." (*Lawrence, supra*, at p. 1221, italics omitted.)

B. *Analysis*

1. *The Governor's Decision*

In reversing the grant of parole, the Governor stated that "[t]he gravity of the second-degree murder perpetrated by Mr. Vasquez alone provides a sufficient basis on which to conclude presently that his release from prison would pose an unreasonable public-safety risk." Specifically, the Governor referred to evidence suggesting an exceptionally callous disregard for human suffering. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(D).) The Governor also found that the evidence "involved some level of premeditation," suggesting that Vasquez's conduct was more than necessary to commit his crime and that he was actually guilty of first degree murder. (See *Dannenberg, supra*, 34 Cal.4th at p. 1098.)

We must determine whether these two reasons, both based on the nature of the commitment offense, support the Governor's unsuitability determination. The Attorney General argues that the Governor did not rely solely on the commitment offense to reverse the grant of parole and suggests he also relied on Vasquez's "evasive conduct" after the crime and a "pattern" of circumstances establishing Vasquez's unsuitability for parole. We reject this assertion as unsupported by the Governor's reversal. (Cf. *In re DeLuna* (2005) 126 Cal.App.4th 585, 593–594 [24 Cal.Rptr.3d 643] ["[w]e must confine our review to the stated factors found by the Board . . . not to findings that the Attorney General now suggests the Board might have made"].)

2. *Exceptionally Callous Disregard for Human Suffering*

██ "Second degree murder is defined as the unlawful killing of a human being with malice aforethought, but without the additional elements—i.e., willfulness, premeditation, and deliberation—that would support a conviction of first degree murder. [Citations.]" (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102 [13 Cal.Rptr.2d 864, 840 P.2d 969].) All second degree murders, by definition, involve callousness or an indifference to the feelings and suffering of others. (*In re Smith, supra*, 114 Cal.App.4th at p. 366.) Because parole is the rule, rather than the exception (*id.* at p. 351), the inquiry must be whether the particular crime was "exceptionally callous," so as to be described as "especially heinous, atrocious or cruel." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

Here, the Governor found that Vasquez demonstrated an exceptionally callous disregard for human suffering when he continued to hit and kick Alarcon after Alarcon had stopped fighting. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(D).) Although not expressly stated, we presume the Governor concluded that this conduct rendered the crime especially heinous, atrocious or cruel. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

Any murder is atrocious and hitting and kicking an unconscious opponent shows a callous disregard for human suffering, but the regulation requires some evidence of exceptional callousness. Here, there is no evidence showing how long or vigorously Vasquez beat Alarcon after Alarcon stopped fighting. Standing alone, the evidence cited by the Governor does not show *exceptional* callousness and was insufficient to show that this particular crime was *especially* heinous, atrocious or cruel. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) Viewing the overall nature of this second degree murder, it does not appear to be particularly egregious and it appears to be *less* egregious than most. (Cf. *Rosenkrantz, supra,* 29 Cal.4th at p. 678 [after a week of planning and rehearsal, defendant killed the victim by firing 10 shots at close range and at least three or four shots into the victim's head as he lay on the pavement].)

3. *Premeditation*

 The Governor concluded that evidence in the record revealed that Vasquez's offense "involved some level of premeditation." While we do not agree with the Governor's suggestion that this crime amounted to a first degree murder, the relevant inquiry is not whether the circumstances of the offense could be considered more aggravated than the minimum necessary to sustain a conviction for second degree murder, but "whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense." (*Lawrence, supra,* 44 Cal.4th at p. 1221.) Thus, the mere existence of facts suggesting the crime involved some level of premeditation does not necessarily constitute evidence that releasing Vasquez on parole would unreasonably endanger public safety. (*Id.* at pp. 1224–1225.)

But for the nature of the crime, all of the applicable regulatory criteria indicate that Vasquez is suitable for parole. (Cal. Code Regs., tit. 15, § 2402, subd. (d).) Vasquez lacked a juvenile record and his two adult convictions did not involve violence. Vasquez has reasonably stable relationships as demonstrated by support letters from several relatives and frequent contact with his parents during his incarceration. He has very marketable job skills and postrelease plans to live with his mother and work nearby. Vasquez has

performed well in prison and received accolades for his work ethic. He has never refused a drug test and has been clean from illegal drugs for 14 years and from alcohol for 11 years. A psychological evaluator described Vasquez as "bright, courteous and high functioning" with no apparent mental health deficits or emotional problems and concluded that Vasquez felt a tremendous amount of regret for his actions and posed little risk to society. Vasquez's probation report indicated that he asked the victim's family for forgiveness and that the family forgave him and blamed the crime on Vasquez's and Alarcon's relationship with Roth. Additionally, Vasquez committed the crime as a result of significant stress.

The Governor does not dispute Vasquez's rehabilitative gains or explain how the commitment offense shows Vasquez is currently dangerous. Rather, the Governor suggests that the stress Vasquez experienced, given the nature and circumstances of the crime, "does not now tip the scales in favor of Mr. Vasquez's parole suitability." However, whether the crime was committed as the result of significant stress in the inmate's life is a mitigating factor (Cal. Code Regs., tit. 15, § 2281, subd. (d)(4)) and the Board found that Vasquez had been under "significant" stress because Alarcon harassed, intimidated and used physical threats and force against him. While the stress Vasquez experienced does not excuse his criminal conduct, it is an important factor because the extenuating circumstances that led to the shooting are unlikely to recur. Significantly, a psychological evaluation noted that Vasquez was not a career criminal and that he demonstrated a "very non-violent history" while incarcerated, suggesting to the evaluator that Vasquez presented little risk or threat. Thus, the stress Vasquez experienced before the crime, when viewed in conjunction with other information in the record, does not support the Governor's ultimate conclusion that Vasquez continues to pose an unreasonable risk to public safety.

In his supplemental brief, the Attorney General asserts that Vasquez continues to claim that he acted in self-defense and that his lack of responsibility and remorse for the crime supports the Governor's conclusion of current dangerousness. We disagree.

The Governor stated that Vasquez "claims to accept responsibility and be remorseful for his actions, yet maintains, including most recently at his 2006 hearing, that he acted in self-defense." The Governor, however, never concluded that Vasquez lacked remorse or failed to accept responsibility for his actions. (*In re Roderick* (2007) 154 Cal.App.4th 242, 265 [65 Cal.Rptr.3d 16] [courts should not infer factors that the Governor might have relied upon].) In any event, to the extent we can infer the Governor did so conclude; this implied conclusion is not supported by the record.

During the 2006 hearing, Vasquez never claimed that he acted in self-defense. Rather, when asked whether his purpose in acquiring the handgun was for protection he responded "Yes, Sir." When describing the altercation, Vasquez stated that he fired the first shot "out of reflex," but then fired the second shot directly at Alarcon. Although Vasquez told a psychologist in 2004 that he felt he had acted in self-defense, he did not reassert this position at the 2006 hearing and never stated that self-defense justified his actions.

A psychologist reported that Vasquez did not believe it was ever right to take another man's life and that Vasquez's level of remorse was consistent with an inmate who has a tremendous regret for the ultimate outcome. Additionally, at the 2006 hearing, the presiding commissioner read a letter that Vasquez had written to Alarcon's family expressing Vasquez's remorse.

The Board concluded that Vasquez showed signs of remorse, indicated an understanding of the nature and magnitude of the offense and accepted responsibility for his behavior. Although the Governor is not bound by the Board's findings (see *Rosenkrantz, supra,* 29 Cal.4th at p. 679), nothing in the record contradicts them. Accordingly, this argument does not constitute some evidence of current dangerousness.

Finally, we reject the Attorney General's suggestion that we remand this matter to the Governor for further consideration in light of *Lawrence* and *Shaputis.* The Governor's constitutional authority is limited to a review of the evidence presented to the Board. (Cal. Const., art. V, § 8, subd. (b) [the Governor may only affirm, modify or reverse the Board's decision "on the basis of the same factors which the parole authority is required to consider"]; see also Pen. Code, § 3041.2, subd. (a).) Our review indicates that the record does not contain some evidence to support the Governor's decision and further consideration by the Governor will not change this fact.

Over 16 years have passed since Vasquez committed the crime and he has made commendable rehabilitative gains during that time showing he is ready to be reintegrated into society and serve the remainder of his sentence outside prison walls. (*Morrissey v. Brewer, supra,* 408 U.S. at p. 477; *People v. Vickers, supra,* 8 Cal.3d at p. 458.) While we agree that there are some crimes so heinous that the nature of the commitment offense may render the inmate unsuitable for parole (*Rosenkrantz, supra,* 29 Cal.4th at p. 682), this is *not* one of those crimes and the evidence in the record shows that Vasquez does not pose an unreasonable risk to public safety.

## DISPOSITION

The Governor's decision to reverse the Board's order granting parole to Vasquez is vacated, and the Board's parole release order is reinstated. In the interests of justice, this opinion is made final as to this court seven days from the date of filing. (Cal. Rules of Court, rule 8.264(b)(3).)

Haller, P. J., and McDonald, J., concurred.