[No. G043001. Fourth Dist., Div. Three. Dec. 15, 2010.]

In re PABLO GOMEZ on Habeas Corpus.

COUNSEL

Pablo Gomez, in pro. per.; and Michael Satris, under appointment by the Court of Appeal, for Petitioner Pablo Gomez.

Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, Jessica N. Blonien and Kathleen R. Frey, Deputy Attorneys General, for Respondent State of California.

OPINION

MOORE, J.—In his petition for a writ of habeas corpus, petitioner challenges the decisions made by the Governor in 2009 and 2010, to reverse the findings of the Board of Parole Hearings (the Board) that he was suitable for parole in November 2008 and November 2009 (his fifth and sixth parole hearings).

In reversing the findings of the Board, the Governor determined petitioner's release on parole posed an unreasonable risk of danger to public safety based on two grounds. First, the Governor found the second degree murder committed by petitioner was especially atrocious and heinous. Second, the Governor concluded petitioner lacked adequate insight into the commission offense because he had given differing versions over the years.

While the Attorney General contends the Governor's reversal of the Board's findings is supported by "some evidence" and should be upheld, we disagree. Twice, the Governor has reversed the Board based solely on the existence of two "immutable factors" which are unsupported by the record, and which amount to a rote recitation of factors the Governor believes are suggestive of risk. Moreover, the Governor has failed to articulate any rational nexus between his reasons for reversing the Board's grant of parole, and any unreasonable risk of danger to public safety posed by petitioner's

release. (See *In re Moses* (2010) 182 Cal.App.4th 1279, 1286 [106 Cal.Rptr.3d 608]; citing *In re Lawrence* (2008) 44 Cal.4th 1181, 1210 [82 Cal.Rptr.3d 169, 190 P.3d 535].)

Accordingly, we conclude the Governor's reversal of the Board's findings of parole suitability have violated petitioner's due process rights. We grant petitioner's petition for a writ of habeas corpus, and order the Governor to vacate his decision and to reinstate the Board's findings that petitioner is suitable for parole as the Board determined in 2008 and 2009.

I

## FACTS AND PROCEEDINGS

*The Commitment Offense*

In December 1989 petitioner was 25 years old. He was married, and he was the father of three young daughters. After an argument with his wife regarding her failure to cook him dinner, he went out with two friends to attend a party in Anaheim. He drank 12 beers at the party, which was more than he usually drank. Around 3:00 a.m. petitioner's friend Manuel Pompa, got into a fight with another partygoer who was a friend of the 18-year-old victim, Jose Pineda. After the fight ended, petitioner went into the kitchen of the residence and armed himself with a kitchen knife that had an eight-inch blade.

Shortly thereafter, petitioner and his two friends left the party in petitioner's vehicle. As they were starting to leave, petitioner observed a second vehicle pull up behind his vehicle. One of the people in the second vehicle was the person who had previously fought with Pompa. Petitioner told Pompa to get out of the vehicle and cause damage to the other vehicle with a tire iron. Pompa did so. By this time, several people who were at the party joined the fracas and began to attack Pompa.

Petitioner, who up until this time had remained inside of his vehicle, disembarked and fought his way over to Pompa. Petitioner grabbed the tire iron from Pompa, and he began to swing the tire iron and his knife at all comers. While petitioner was swinging the knife, he stabbed Pineda. Pineda died as a result of a stab wound to the abdomen.

In 1990, petitioner was convicted by a jury of second degree murder in connection with Pineda's death. He was sentenced to 15 years to life in state prison. He began serving his prison term in November of 1990. Under California's statutory parole scheme he became presumptively eligible for release over 10 years ago.

*The 2008 Parole Hearing*

Petitioner told the Board he took out the kitchen knife for "protection," because Pompa had been beaten up by the victim's friend, and because he was "scared" of people he believed were outside waiting for them. He also said his decision was influenced by the fact he was drunk. As to the actual stabbing, petitioner told the Board, "I just remembered I was just moving my hand back and forth with the knife. Suddenly I stabbed this guy." When queried by the presiding commissioner regarding whether he realized at the time that he had stabbed the victim, petitioner responded "No," and said he did not know the victim had died until the day he was arrested for the crime.

In addressing the changes he had made to his life since he had been incarcerated, petitioner said: "I see the person I was back then to—I have done a lot of changes to that due to the—all the groups that I have attended; therapy groups. . . . I could [have] done a lot of things differently if I had known the tools that I have learned right now. . . . Sadly, I hurt a lot of people from my actions and I have tried to do my best. I tried to do my best to change the person that I was out there."[1]

*The Board's 2008 Decision*

In concluding petitioner would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison, the Board found him suitable for parole. At the outset, the Board acknowledged the life crime was "very callous and showed a disregard for human suffering" because petitioner instigated others to take a tire iron and to break the windshield of another person's vehicle during what turned into "a melee at a party."

The Board noted "for a period of time" petitioner had excused his behavior on the fact he was "mad" at his wife because she didn't cook him dinner, and if she had done so, he might have stayed home that night and not gotten into trouble. The Board recognized that petitioner, having matured and attended many programs, finally accepted responsibility for stabbing the victim.

In this regard, the Board told him: "You've come around from that and the Panel believes that you have accepted your responsibility for your participation in this murder. You've indicated in the past you didn't realize you stabbed somebody. . . . You've thought about it. You've gained insight into what caused it, this murder to occur. . . . But the positive aspects of your

---

[1] In petitioner's 2008 psychological evaluation, the evaluator opined petitioner spoke about the commitment crime with "increased insight" into the internal and external factors which led to the commission of the crime, and was able to take full responsibility for his immature and reckless choices.

case, at this point, including your insight, your remorse, your level of understanding into what happened and the progress that you've made in the meantime are all positive and in your favor and have resulted in a consideration for your grant tonight. . . . You're accepting responsibility, even though, initially, you didn't realize you stabbed anybody. Regardless, you are accepting the fact that you, in fact, did and you're not making any excuses for your behavior. And that, certainly, is all a positive set of attitudes."

The Board also considered these additional factors in its finding of parole eligibility: Petitioner had no juvenile record of assaulting others; he had a relatively stable social history; he was not involved in gangs; he did not have an extensive criminal history except for driving on a suspended license; he did not have an extensive alcohol and drug history; and, he had positive parole plans. Moreover, the Board took into account that petitioner's July 2008 psychological evaluation, rated him as being in the "low range" for the likelihood of future violence.[2] Moreover, the Board noted petitioner had not engaged in institutional misconduct except for a single "CDC 115" violation in 2003 for "excessive conduct" while in the visiting room with his ex-wife, and a spate of 128 "counseling chronos," all prior to 1997.[3]

*The Governor's 2009 Reversal of the Board's 2008 Findings*

In reversing the Board's 2008 findings that petitioner was suitable for parole, the Governor relied on two factors in his decision—the commitment crime, and the Governor's perception that petitioner had failed to take responsibility for his actions.

First, the Governor characterized the crime of second degree murder in this case as being "especially atrocious" and as manifesting "a shocking disregard for the life of others" because petitioner had the opportunity to avoid the murder, and he did not do so. The Governor also cited to the fact that petitioner was inside of his vehicle when the free-for-all started, but instead chose to get out of his vehicle and begin swinging a tire iron and a knife in a crowd of people. The Governor further described the crime as being very

---

[2] The panel also addressed petitioner's extensive programming which included numerous certificates, involvement on a continual basis for almost 10 years in self-help and therapy in Alcoholics Anonymous (AA) and Narcotics Anonymous (NA), and for obtaining his general education diploma (GED) in 1997. The Board further commended him for the fact that despite being unschooled when he entered prison, he had brought his reading skills up to the level of 12.9 school years.

[3] A "CDC 115" violation is one that is "believed to be a violation of law or [that] is not minor in nature," and a "128 disciplinary chrono" is minor misconduct that recurs after verbal counseling. (Cal. Code Regs., tit. 15, § 3312, subd. (a)(2), (3).)

"callous" because the circumstances involved a "melee at a party." Lastly, he considered the fact that evidence in the record established the victim suffered multiple stab wounds.[4]

Second, the Governor determined petitioner had not accepted full responsibility for his actions because over the years he had given various renditions of the circumstances surrounding the commitment offense. The Governor noted petitioner had initially told his probation officer that while he had a kitchen knife in his possession, he never pulled it out to use on anyone, and that the knife was taken from him while he was being assaulted by others. Then, in 1998, petitioner indicated to his mental health evaluator that for a long time he felt that but for his wife's inaction in not preparing dinner for him that night, he might have stayed home and not gotten into trouble. In 2006, petitioner told his mental health evaluator that "for many years" he tried to "black out" the fact that he had stabbed someone.

The Governor further cited to inconsistent statements petitioner made to the Board during his 2008 parole suitability hearing regarding the commitment offense. Petitioner told the Board that while he and his friends were being assaulted, he "just remembered [he] was just moving [his] hand back and forth with the knife. Suddenly, [he] stabbed this guy." Yet, petitioner also told the Board he did not realize he had stabbed anyone despite evidence in the record which revealed he told Pompa he stabbed one person, and possibly a second person. Lastly, the Governor advised he was in accord with the position taken by the deputy district attorney who appeared at the hearing on behalf of the People, and who said regarding petitioner, "He still says he doesn't know who stabbed the man and it is hard to believe a knife went into somebody's body and [he] didn't know it."

*The 2009 Parole Hearing*

One year later, petitioner again appeared before the Board. In concluding petitioner would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison, the Board found petitioner suitable for parole. Attempting to address the Governor's concerns regarding petitioner's minimization of his culpability because of his differing renditions of events he had given, as well as petitioner's statement he did not "know" he had stabbed the victim, the Board extensively queried him.

Petitioner told the Board, ". . . I cannot tell you exactly at what point I stabbed Mr. Pineda. I can only tell you that it was between me getting up out

---

[4] There remains a question whether the victim was stabbed once or multiple times. The trial testimony indicates there were no other injuries to the victim's body other than a stab wound, and a slight scraping to the back of one finger. However, the presentence probation report indicates the victim was also treated for multiple trauma and stab wounds.

of the car and when I took off running from there." Petitioner further said he told Pompa he thought he had probably stabbed someone. This belief was based on the fact he was still holding on to the handle of the knife, but the blade was gone. As petitioner explained ". . . I don't know at what moment I stabbed him, because I was still holding the handle and I was still protecting myself like that, you know, like moving my hands. [¶] . . . [¶] Then I noticed that I was only holding on to the handle . . . ."[5]

Of import is petitioner's admission to the Board that, while he previously tried to blame other people for his actions, including his wife, "right after that I started taking self-help groups and come to terms that I was the only one to blame for my actions. I'm the one responsible for that, nobody else." He explained to the Board he had experienced a major shift in his thought process during 1991 or 1992, after attending AA, and a class called "Alternatives to Violence." Moreover, petitioner further explained, he was "not wanting to accept in my heart the fact that I had hurt someone so badly or taken Mr. Pineda's life. It was something for me real hard to cope with . . . . And to me it was very hard to have told me that I have killed someone." He further stated, "And no matter what excuse I can use at the beginning of my sentence, the fact is I'm the only person responsible for me arming myself, going out there, being drunk, and I take full responsibility for that. There is nobody to blame for that."

*The Board Decision*

In concluding petitioner would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison, the Board again found him suitable for parole. Explaining its conclusion, the Board noted at the outset the motive for the crime was very "trivial" because circumstances involved a party getting out of hand.

To address the Governor's concerns related to petitioner's "different versions and insight" the Board explained its review process in detail on the record, and advised, "what we've done is go back over those psychological evaluations and looked at what the masters degree and doctor[ate] people have concluded." The Board wrote: "Over the years, as one matures one

---

[5] This court's nonpublished opinion in *People v. Gomez* (Dec. 19, 1991, G010300) recites facts consistent with petitioner's version of the events as it relates to what he told Pompa after the killing. The opinion notes Pompa was subpoenaed for trial and made a brief appearance. However, he then took off for parts unknown. Based on Pompa's subsequent disappearance, the court allowed the prosecution to read into evidence Pompa's preliminary hearing testimony. At the preliminary hearing, Pompa testified petitioner told him he had obtained a knife from the kitchen of the house where the party was held and struck someone, but was not sure whether he stabbed the person.

certainly views things a lot differently than at 25, and when you get in your 40s, which is where you are now, certainly your view changes and your attitude changes and even your understanding of things and your own behavior changes and you can look at it much more clearly from a distance, and we believe that that's what's happened. So we took all that into consideration, the concerns of the Governor, and the statement of Mr. Pompa previously and the difference in his statement between what he told officers initially and what he testified to in regards to this physical altercation that resulted in Mr. Pineda's death, and your statement afterwards, because the concern was that you said you stabbed somebody and you knew it, and then his version was different. [Y]ou [petitioner] didn't remember stabbing anybody. [B]ut *the main thing is that you accept the fact that you didn't initially want to accept the fact that you'd killed somebody*; it was very hard for you to accept it, but over time you participated in a lot of self-help and a lot of introspection, looking into your own life and your mental state and your behavior and have accepted responsibility, and we note that in the psychological evaluations. We believe you when you express remorse for the death of Mr. Pineda. We also want to note that the positive considerations that we believe tend toward suitability and that is your expression of remorse . . . ."[6] (Italics added.)

*The Governor's 2010 Reversal of the Board's 2009 Findings*

In reversing the Board's 2009 findings that petitioner was suitable for parole, the Governor relied upon the same factors he had previously considered: (1) the commitment crime; and (2) petitioner's failure to take responsibility for his actions.

The Governor again found the second degree murder in this case was "especially heinous" because petitioner's violent action escalated a situation in which he was initially uninvolved, and which resulted in the victim's death. Also, the Governor concluded petitioner demonstrated a "callous disregard" for others because he swung a tire iron and a knife where many people were gathered; his motive for the crime was exceedingly trivial in relation to the magnitude of the offense he committed; and because the probation report indicated the victim suffered "multiple stab wounds."

Again, the Governor relied upon petitioner's failure to exhibit "full insight" into the life offense. In support of this factor, the Governor noted a particular

---

[6] The Board noted in petitioner's 2008 psychological evaluation the evaluator opined petitioner had demonstrated increased insight into the internal and external factors which led to the commission of the crime, and had taken full responsibility for his actions. The Board further noted that in petitioner's 2006 evaluation, the evaluator concluded petitioner had accepted responsibility for the crime and had insight into the causative factors along with expressing remorse and regret.

"concern" that petitioner had made "significant" changes to his story, citing inconsistent statements petitioner made over the years. And, as he had done previously, the Governor noted that he was in accord with the position taken by the deputy district attorney who appeared at the hearing on behalf of the People.

*Subsequent Proceedings*

After the Governor's 2009 reversal, petitioner filed a petition for a writ of habeas corpus that was denied by the superior court in July 2009. In December 2009, petitioner filed his original petition for a writ of habeas corpus in this court. The Attorney General filed its informal response in February 2010. In April 2010, this court issued an order to show cause. We appointed counsel to represent petitioner, and in May 2010 counsel filed a supplemental petition for a writ of habeas corpus on petitioner's behalf.[7]

II

DISCUSSION

*The General Governing Law*

█ The federal and state Constitutions prohibit the state from depriving any person of life, liberty, or property without due process of law. (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7.) "[T]he due process clause requires, among other things, that the factual basis of a decision by the Board [or Governor] denying parole must be premised upon some evidence relevant to the factors the Board is required to consider." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 663 [128 Cal.Rptr.2d 104, 59 P.3d 174].)

█ "The granting of parole is an essential part of our criminal justice system and is intended to assist those convicted of crime to integrate into society as constructive individuals *as soon as possible* and alleviate the cost of maintaining them in custodial facilities. [Citations.] Release on parole is said to be the rule, rather than the exception [citations] and the Board is

---

[7] Petitioner filed a motion in May of 2010 to expand this court's order to show cause to include the Governor's 2010 reversal of the Board's 2009 grant of parole. We hereby grant the motion. The records upon which both reversals are based are the same, as well as the Governor's reasoning for reversal in both instances. No prejudice has inured because the Attorney General's return which was filed in June 2010, amply addresses both the 2009 and 2010 reversals. Moreover, requiring petitioner to first seek relief by filing a petition for a writ of habeas corpus in the superior court before seeking relief in this court appears to us to be a futile gesture since the superior court has previously denied relief based on the identical factors.

required to set a release date unless it determines that 'the gravity of the current convicted offense . . . is such that consideration of the public safety requires a more lengthy period of incarceration . . . .' [Citation.]" (*In re Vasquez* (2009) 170 Cal.App.4th 370, 379–380 [87 Cal.Rptr.3d 853].)

■ While the Board and the Governor are given a great deal of discretion in regard to their decisionmaking process, the discretion is not unfettered. The decision to grant parole is a subjective determination. It is guided by a number of factors, such as those identified in Penal Code section 3041, and the Board's regulations. (Cal. Code Regs., tit. 15, §§ 2281, 2402; *In re Rosenkrantz, supra,* 29 Cal.4th at pp. 653–655, 660–661.)

Included among those factors is that pursuant to statute, the Board " 'shall normally set a parole release date' one year prior to the inmate's minimum eligible parole release date, and shall set the date 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude *in respect to their threat to the public* . . . .' [Citation.] Subdivision (b) of section 3041 provides that a release date must be set 'unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the *public safety* requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.' [Citation.]" (*In re Lawrence, supra,* 44 Cal.4th at p. 1202.)

■ Additionally, "Title 15, section 2281 of the California Code of Regulations sets forth the factors to be considered by the Board in carrying out the mandate of the statute. The regulation is designed to guide the Board's assessment of whether the inmate poses 'an unreasonable risk of danger to society if released from prison,' and thus whether he or she is suitable for parole. [Citation.] The regulation also lists several circumstances relating to *unsuitability* for parole . . . and the mitigating circumstances of the crime." (*In re Lawrence, supra,* 44 Cal.4th at p. 1202, fns. omitted.)

In determining whether a petitioner is suitable for parole, the Board and the Governor must consider "[a]ll relevant, reliable information." (Cal. Code Regs., tit. 15, § 2402, subd. (b).) This information includes the nature of the commitment offense including behavior before, during, and after the crime; the prisoner's social history; mental state; criminal record; attitude towards the crime; and parole plans. (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

Circumstances tend to show the Board adequately analyzed petitioner's suitability for release. They include the facts that he does not have a record of assaulting or personally harming others, has a stable social history and has shown signs of remorse. He is now in his mid-40's which reduces the

probability of recidivism. The record shows he has made realistic plans for release and has educated himself to develop marketable skills to be put to use upon release. (Cal. Code Regs., tit. 15, § 2402, subd. (d); *In re Rosenkrantz, supra,* 29 Cal.4th at p. 654; see also *In re Lawrence, supra,* 44 Cal.4th at pp. 1201–1203.)

■ The Governor's decision to affirm, modify, or reverse the decision of the Board rests on the same factors that guide the Board's decision (Cal. Const., art. V, § 8, subd. (b)), and is based on "materials provided by the parole authority" (Pen. Code § 3041.2, subd. (a)). "Although these provisions contemplate that the Governor will undertake an independent, de novo review of the prisoner's suitability for parole, the Governor's review is limited to the same considerations that inform the Board's decision." (*In re Rosenkrantz, supra,* 29 Cal.4th at pp. 660–661.)

*Standards of Judicial Review*

In *In re Rosenkrantz, supra,* 29 Cal.4th at page 658, the court set forth the standard that is required when reviewing a parole decision. That is, whether some evidence in the record before the Board or the Governor supports the decision to deny parole based on appropriate factors set out in the above discussed regulations and statutes. The *Lawrence* court reaffirmed this analysis, but also recognized "courts have struggled to strike an appropriate balance between deference to the Board and the Governor and meaningful review of parole decisions. A growing tension has emerged in the decisions regarding the precise contours of the 'some evidence' standard of review." (*In re Lawrence, supra,* 44 Cal.4th at p. 1206.)

■ *Lawrence* thus clarified that "when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings. [Citations.]" (*In re Lawrence, supra,* 44 Cal.4th at p. 1212.) As the court further stated, "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Ibid.*)

Moreover, as the court further explained in *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573], the companion case issued on the same day as *Lawrence,* that "the aggravated nature of a commitment offense does not, in every case, provide relevant evidence that an inmate remains dangerous, and a focus upon the egregiousness of the commitment offense to

the exclusion of other relevant evidence has proved in practice to obscure the core statutory emphasis upon *current* dangerousness . . . ." (*Id.* at p. 1254.) Accordingly, " 'the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude. [Citation.]' [Citation.]" (*Id.* at pp. 1254–1255.)

■ While our deferential standard of review requires us to credit the Governor's findings if they are supported by a "modicum of evidence," evidence suggesting a commitment offense was "particularly egregious or heinous" does not provide adequate support that an inmate is unsuitable for parole ad infinitem. The "some evidence" test which we apply in basing our decision "must have some rational basis in fact." (*In re Scott* (2005) 133 Cal.App.4th 573, 590, fn. 6 [34 Cal.Rptr.3d 905].) Or, "The exceedingly deferential nature of the 'some evidence' standard of judicial review set forth in *Rosenkrantz, supra*, 29 Cal.4th 616, does not convert a court reviewing the denial of parole into a potted plant." (*In re Scott* (2004) 119 Cal.App.4th 871, 898 [15 Cal.Rptr.3d 32].)

Taking all the above into consideration, our job requires us to independently review the record to determine whether there is "some evidence" to support the Governor's decision to reverse petitioner's grant of parole. (*In re Scott, supra*, 119 Cal.App.4th at p. 884.) We independently review the record to determine whether those factors relied upon by the Governor in his decision to reverse the Board's grant of parole, establish that petitioner is currently dangerous when viewed in light of the full record before us. (*In re Vasquez, supra*, 170 Cal.App.4th at pp. 382–383.) Our review of the record leads us to conclude no facts in the record support the Governor's decision to reverse the Board's finding that petitioner was suitable for parole.

*No Evidence Establishes the Commitment Offense Predictive of Petitioner's Future Dangerousness*

The Governor found the commitment offense to be of a "heinous" and "atrocious" nature. We cannot conclude that a characterization of an offense alone is sufficient to support a denial of parole.

■ A petitioner cannot change the nature of the commitment offense or a prior record. Reliance on such immutable factors may be unfair and contrary to the rehabilitative goals of our penal system and the requirements of due

process. (*In re Scott, supra*, 133 Cal.App.4th at pp. 594–595.) "When . . . all of the information in a postconviction record supports the determination that the inmate is rehabilitated and no longer poses a danger to public safety, and the Governor has neither disputed the petitioner's rehabilitative gains nor, importantly, related the commitment offense to current circumstances or suggested that any further rehabilitation might change the ultimate decision that petitioner remains a danger, mere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required 'modicum of evidence' of unsuitability." (*In re Lawrence, supra*, 44 Cal.4th at pp. 1226–1227.)

The California Supreme Court has determined that " 'It is well established that a policy of rejecting parole solely upon the basis of the type of offense, without individualized treatment and due consideration, deprives an inmate of due process of law.' [Citation.]" (*In re Lawrence, supra*, 44 Cal.4th at p. 1210.) While "the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Id.* at p. 1214.)

The Governor described petitioner's crime as heinous and atrocious. But such a characterization can be made about all second degree murders. The crime involves some amount of viciousness or callousness. (*In re Weider* (2006) 145 Cal.App.4th 570, 587 [52 Cal.Rptr.3d 147].) Second degree murder is defined as the unlawful killing of a human being with malice aforethought. (Pen. Code, §§ 187, subd. (a), 189.) The true inquiry should be whether, among second degree murders, this one should be evaluated as being *particularly* heinous and atrocious. (*In re Lee* (2006) 143 Cal.App.4th 1400, 1410 [49 Cal.Rptr.3d 931].)

As the court in *In re Lawrence, supra*, 44 Cal.4th at page 1218, points out, there are few murders that cannot be described as being particularly aggravated, or as involving some act beyond the minimum required for conviction of the offense so that "a strict minimum elements inquiry [by a reviewing court] would mandate upholding in every case the denial of parole, regardless of whether other evidence in the record clearly attenuates the predictive value of the offense, and without any consideration of whether the gravity of the

offense continues to provide some evidence that the inmate remains a threat to public safety many years after commission of his or her offense."

While the killing here was, indeed, atrocious and heinous, it was not "especially atrocious" or "particularly heinous" as compared to other second degree murders because evidence established petitioner was under the influence of alcohol at the time he stabbed the victim, and had ingested more alcohol than he was accustomed to drinking. The nomenclature applied by the Governor fails to convince us the Board's decision should be reversed. Nothing in the record shows a connection between petitioner's past crimes which were committed over 20 years ago, and his state of current dangerousness today.

Nor does it appear that petitioner was given individualized consideration this time around. The language used in both of the Governor's reversals is the same: " '[A] policy of rejecting parole solely upon the basis of the type of offense, without individualized treatment and due consideration, deprives an inmate of due process of law.' [Citation.]" (*In re Lawrence, supra,* 44 Cal.4th at p. 1210.)

*No Evidence Established Petitioner Lacked Full Insight into His Commitment Offense*

The Governor determined petitioner lacked insight into the commitment offense because he gave differing versions of the events over the years, but we find no evidence in the record to support that conclusion. The record amply demonstrates petitioner's changed version of the events was consistent with his newly developed insight, gained through the prison's varied programs.

Since *In re Lawrence, supra,* 44 Cal.4th at pages 1181, 1206, and *In re Shaputis, supra,* 44 Cal.4th 1241, were decided, the use of the lack-of-insight factor and the weight placed upon it has increased exponentially. Previous to those decisions, the Board and Governor primarily relied on other factors.

Petitioner has acknowledged that he stabbed Pineda and has accepted responsibility for his actions. Although he initially said he did not believe he stabbed Pineda, the record amply demonstrates he now acknowledges his crime. The decision by the Board that he was eligible for parole in 2009 aptly sums up the change: "[B]ut *the main thing is that you accept the fact that you didn't initially want to accept the fact that you'd killed somebody . . . .*" (Italics added.)

The Governor's continued reliance on petitioner's supposed lack of insight after his full acknowledgement of his crime has transformed into an immutable factor. The effect of this position is to transmute petitioner's sentence into life without the possibility of parole.

■ Accordingly, we reverse the decision of the Governor and we reinstate the decision of the Board which found petitioner suitable for parole. To do any less would violate the holding of *In re Lawrence, supra*, 44 Cal.4th at pages 1211–1212, that "our 'judicial review must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights.' " (*In re Moses, supra*, 182 Cal.App.4th at p. 1312.)

*The Proper Remedy in This Case*

■ The Attorney General argues that should we reverse the decision of the Governor and reinstate the decision of the Board finding parole suitability, we should remand the case back to the Governor with instructions to proceed in accordance with due process of law. "[T]he proper remedy is to vacate the Governor's decision and to reinstate that of the Board. [Citation.]" (*In re Burdan* (2008) 169 Cal.App.4th 18, 39 [86 Cal.Rptr.3d 549]; see *In re Vasquez, supra*, 170 Cal.App.4th at p. 386 [Governor's decision to reverse Board order granting inmate parole vacated and Board's parole release order reinstated]; *In re Aguilar* (2008) 168 Cal.App.4th 1479, 1491–1492 [86 Cal.Rptr.3d 498]; and *In re Lawrence, supra*, 44 Cal.4th at pp. 1190, 1201, 1229 [affirming the Court of Appeal decision to vacate Governor's denial of parole and reinstate the Board's grant]; see also *In re Masoner* (2009) 179 Cal.App.4th 1531, 1536, 1539 [102 Cal.Rptr.3d 463].)

*Petitioner Is Not Entitled to Credit Allowing Him an Early Discharge*

Petitioner next contends he is entitled to credit against his parole term for the period between the time the Governor reversed the Board's finding of suitability for parole and this court's granting of his petition. Under his reasoning, he should be entitled to an early discharge from parole immediately upon his release. We disagree.

This issue has been resolved against petitioner. In *In re Chaudhary* (2009) 172 Cal.App.4th 32 [90 Cal.Rptr.3d 678], the court held that the time spent in prison after the effective date of a grant of parole reversed by the Governor, and then reinstated by the court, did not satisfy any part of the five-year period between release from prison and eligibility for discharge as required by Penal Code section 3000.1.

In *Chaudhary*, petitioner was convicted of second degree murder and was released on parole after 19 years in prison. His release on parole was then followed by a grant of parole by the Board, with a reversal of that parole grant by the Governor, and a decision by the court to vacate the Governor's reversal and to reinstate the Board's parole grant. Petitioner ultimately spent three years 10 months in prison beyond the length of the term set by the

Board when it granted his parole. Moreover, two years six months of the prison time occurred after the effective date of the Board's grant of parole. (*In re Chaudhary, supra*, 172 Cal.App.4th at p. 35.)

 The court reversed the superior court's order which found that the two-year six-month period that petitioner spent in prison after the effective date of the Board's grant of parole should be credited against Penal Code section 3000.1's five-year parole discharge eligibility requirement. (*In re Chaudhary, supra*, 172 Cal.App.4th at p. 35.) In reversing the lower court's decision, the court concluded that under Penal Code section 3000.1, subdivision (a), petitioner's period of parole was for the remainder of his life, and that a person who is subject to a parole period of life as a result of a second degree murder conviction is eligible for discharge from parole "when [he] has been released on parole from the state prison, and has been on parole continuously for . . . five years . . . since release from confinement . . . ." (§ 3000.1, subd. (b).)

Relying on the plain meaning of the statute, the *Chaudhary* court concluded, "By placing these explicit limitations on the parole discharge eligibility requirement, the Legislature made unmistakably clear that a parolee must *first* have 'been *released* on parole' and must *then* complete five continuous years on parole after the parolee's 'release from *confinement*.' This intent explicitly precludes the application of any time spent *in custody prior to release* to satisfy any part of section 3000.1's five-year parole discharge eligibility requirement." (*In re Chaudhary, supra*, 172 Cal.App.4th at p. 37.) Petitioner's claim thus fails.

## III

## DISPOSITION

The petition for a writ of habeas corpus is granted. The Board's grant of parole is hereby reinstated.[8] At oral argument, there was discussion about whether *In re Prather* (2010) 50 Cal.4th 238 [112 Cal.Rptr.3d 291, 234 P.3d 541], required remand to the Governor for further consideration. Since *Prather* addressed a Board's denial of parole, we are not concerned with infringing on the authority of the executive. "Here, in contrast, we reinstate an earlier executive branch decision—made by the Board—overturning only

---

[8] Of course, the Board retains its power to rescind that parole on an appropriate record based on events occurring after its 2009 suitability determination. (*In re Moses, supra*, 182 Cal.App.4th at p. 1313; *In re Powell* (1988) 45 Cal.3d 894, 901–902 [248 Cal.Rptr. 431, 755 P.2d 881]; Pen. Code, §§ 3041.5, 3041.7; Cal. Code Regs., tit. 15, § 2450.)

the 'veto' of that decision by the Governor. [Citation.] The power of the executive branch is, in this instance, not infringed, but respected." (*In re McDonald* (2010) 189 Cal.App.4th 1008, 1024.) In the interests of justice, this opinion is made final as to this court five days from the date of filing. (Cal. Rules of Court, rule 8.387(b)(3)(A); *In re Aguilar, supra*, 168 Cal.App.4th at p. 1492.)

Rylaarsdam, Acting P. J., and Aronson, J., concurred.