Filed 9/16/13  In re Morales CA3

# NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re ROBERT MORALES, <br><br> On Habeas Corpus. | C071281 <br><br> (Super. Ct. No. 11F04304) |

Defendant Robert Morales has been in prison for 22 years for fatally stabbing one man and critically wounding another following a failed car burglary.  The Board of Parole Hearings (Board) denied defendant's request for parole, explaining its reasoning as follows:  "The first consideration which does weigh against suitability today is the commitment offense, and the Panel feels there is an adequate nexus between the commitment offense and your current risk of danger based on the fact that this is a crime that has never been considered by a previous Panel."  The Board then purported  to describe additional unsuitability factors revealed by the record, but failed to relate how those factors were in any way probative of defendant's current dangerousness.  The Board then stated that after "weighing all of the evidence presented today, you're unsuitable [for] parole because you pose a current and unreasonable risk of danger if released and require at least an additional five years of incarceration."

1

Defendant petitioned the trial court for a writ of habeas corpus to overturn the Board's decision. In a 23-page decision, the trial court granted defendant's petition. The trial court explained that the factors enumerated by the Board were either unsupported by the record or lacked a nexus to current dangerousness.

The People now appeal to this court. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A

*Defendant's Background Leading Up To*

*The Commitment Offense Of Murder*

Defendant was raised in West Sacramento with seven siblings. His father abandoned the family when defendant was young, and his parents divorced because his father physically abused defendant's mother, which was something defendant witnessed. His father physically abused him, too, and a lot of defendant's anger "stemmed from that." He was unable to show emotions, weakness, or fear, or walk away from challenging situations because he grew up in a "machismo" culture. He "felt less than others as a child" because he did not have a family unit or "good things to go to school with, [like] clothing." He did not have coping mechanisms, so he found ways to escape, including turning to drugs and alcohol, which he first tried at age eight or nine.

Defendant began drinking four times a week when he was an adolescent and began smoking marijuana daily at age 17. He was 18 at the time of the commitment offense, and he was severely intoxicated on alcohol at that time, as well as under the influence of marijuana

B

*The Murder*

In December 1988, defendant and his younger brother were drinking and socializing with a friend at her Sacramento apartment. Defendant wanted to leave and took his brother with him. Defendant thought about taking the light rail home but then

2

decided they should steal a car, although defendant had enough money to pay the fare. His brother said, " 'let's not do it,' but he went along." Defendant identified the car to steal at the apartment complex, and at his request, his brother broke the window. Confronted by a resident of the complex who drew a gun, defendant and his brother fled on foot. They were pursued by several apartment residents, including victims Terry McFarland and John Fitzgerald.

Defendant began to "physically engage" McFarland. Fitzgerald pushed defendant onto the lawn. Defendant pulled out a knife, and Fitzgerald yelled, "knife." McFarland got out a baseball bat. Fitzgerald struggled on the ground with defendant's brother, while McFarland held the bat " 'in a batter's stance' " and repeatedly asked defendant to " 'drop the knife.' " Defendant lunged at McFarland. McFarland stumbled backwards but was still holding the bat. Defendant had fatally stabbed McFarland in his chest and shoulder. Fitzgerald got hold of the bat and hit defendant in the arm with it while repeatedly yelling, " 'drop the knife.' " Defendant and his brother "somehow pushed [Fitzgerald] forward," and he slipped. Defendant's brother held Fitzgerald down, while defendant stabbed Fitzgerald. Defendant also got hold of the bat and hit Fitzgerald in the mouth. Eventually, an off-duty police officer intervened. Fitzgerald had been stabbed four times, his teeth were broken, and his lips were cut.

A jury found defendant guilty of felony first degree murder and attempted murder and the court sentenced him to 36 years to life in prison.

C

*Behavior While Incarcerated*

Defendant has been incarcerated since February 1991. Defendant has had no rule violation reports (CDCR form 115), which are violations of law or misconduct that is not minor in nature. He has had four counseling chronos (CDCR form 128-A) for improper conduct with his girlfriend when she visited him in 1997, disobeying an officer's order in 1997, disrespectful behavior toward an officer in 2003, and possessing two pounds of

3

stolen pinto beans in 2010. A counseling chrono documents an incident of " 'minor misconduct.' " (*In re Reed* (2009) 171 Cal.App.4th 1071, 1077 [explaining the prison nomenclature for different types of misconduct].)

Defendant completed his GED (general educational development) and received his high school diploma while incarcerated. He is five classes away from receiving his associate of arts degree.

Defendant "has worked or attended vocational training during most of his incarceration," including as a sewing machine operator, silk-screener, porter, education clerk (including a teacher's aide), vocational plumber, and vocational dry cleaner.

Defendant has not used drugs or alcohol while incarcerated. He attended Alcoholics Anonymous meetings for a brief period and then began an addiction recovery counseling program in 2005. He has been working as a counselor in the program since 2009.

D

*Plans If Released*

Defendant plans to live at a transitional housing program in Berkeley, where he would be able to work as a paid chemical dependency counselor in the program. His backup plan is to live in a transitional housing program in Sacramento if required to parole to his county of commitment. His parole plans were deemed "feasible" by the psychologist who interviewed him, and the Board stated it did not "have any concerns" with them.

E

*Psychological Report From May 2010*

Richard Hayward is a forensic psychologist for the California Department of Corrections and Rehabilitation who authored a report on defendant in May 2010. For the report, the psychologist reviewed defendant's prison central file and his health records, and interviewed him.

In a section entitled "insight and self-assessment," the psychologist stated defendant "displayed moderate insight into his antisocial thinking and behavior at the time of the commitment offense. He described himself as failing to internalize the correct values at that time, which enabled him to make the decision to steal a car on the evening of the offense. He added that he was engaging in criminal thinking and addictive thinking when he made that decision. He recalled that he also subscribed to . . . machismo thinking. . . . [H]is machismo thinking caused him to escalate his aggressive behavior when he and his brother were confronted while attempting to steal the vehicle." He displayed "significant insight into his abuse of alcohol and marijuana as primary contributing factors to the offense. He noted that these substances impaired his judgment and contributed to his highly impulsive decision to attempt to steal a car. . . . [H]e and his brother had never stolen a vehicle prior to that time, and they had no knowledge regarding how to hot wire the car after they broke into it. . . . [T]he offense never would have happened if he was clean and sober since clear thinking would have led him to conclude that he did not know how to steal a car." Defendant "reported he has matured as a result of his programming and personal growth experiences during his incarceration. He stated that he no longer endorses the machismo values that caused him to become aggressive at the age of 18. He noted a significant improvement of his communication skills that currently allows him to communicate effectively with everyone. He describes himself as having learned the value of lives of others and having learned how to deescalate conflict."

In a section entitled "role that alcohol/drugs played in the commitment offense and inmate's ability to refrain from future use in free community," defendant "reported that he was severely intoxicated on alcohol at the time of the commitment offense" and "stated that he also had been smoking cannabis." He "stated that he drank alcohol primarily to fit in with his peers and to feel more sociable. He added that he did not like the loss of control associated with alcohol intoxication. He noted that alcohol impaired

his judgment and prevented him from thinking clearly. He explained that his decisions to steal a car and then to pull out his knife at the time of the offense were impulsive and were associated with his significant intoxication. He observed that his use of cannabis additionally reduced his ability to think clearly and prevented him from considering the consequences of his decisions. He noted that this intoxication on cannabis also contributed to his decision to attempt to steal a car despite his lack of any knowledge of how to start a vehicle without a key."

In a section entitled "current mental status/treatment needs," the psychologist described defendant as "courteous, informative and cooperative." "There were no current indications of impaired impulse control."

In a section entitled "impulsivity/behavioral control," the psychologist noted defendant's central file "indicate[d] that [defendant] displayed severely impaired impulse and behavioral control at the time of the commitment offense." His behavior while incarcerated suggests "a substantial level of impulse control with infrequent lapses that were considered minor. There were no infractions that were associated with an increased risk of violence." "There were no signs during the interview to indicate impairment of impulse control or judgment. [Defendant] was calm during the interview, with no signs of irritability, annoyance or impatience."

In a section entitled "life crime," the psychologist reported that defendant said he was "scared" and "did what [he] felt [he] had to do to protect [his] brother and [him]self." The psychologist's opinion was that "[t]here were no significant discrepancies between [defendant']s version of the crime and what was found in the Probation Officer's Report."

In a section entitled "remorse and insight into life crime," the psychologist stated the following: The central file records indicate defendant "has acknowledged responsibility for the offense and has expressed remorse for the victims and their families since his arrest. He also acknowledged responsibility for the offense during the current

interview. He expressed remorse for killing the victim and for the serious injuries to the second victim. He noted that he hurt many people and that the victim's family suffered tremendously. [¶] The observations from the interview indicated that during his incarceration [defendant] has gained insight into several of the factors that contributed to the offense, including his failure to internalize the right values, his problems with alcohol and cannabis and his machismo values that increased his aggressive responses. He had less insight into the loss of control of his aggressive impulses and anger that resulted in his stabbing the two victims. He displayed limited insight into his failure to develop empathy for others as a youth."

In a section entitled "the prisoner's violence potential in the free community," the psychologist stated the following: Based on psychological testing, defendant was in the low range of psychopathy compared to other male offenders. His "behavioral patterns that were associated with psychopathy included a callous approach to others that allowed him to stab two victims during the commitment offense. His actions also provided evidence of his failure to develop a significant degree of empathy for others as a youth." "There was evidence of a failure to accept responsibility for his actions as indicated by his description of self-defense as a motivation for stabbing the victims at the time of the offense." Defendant "displayed several behavioral patterns that were associated with lower levels of psychopathy. His presentation during the interview was genuine with no indications of inflated ideas or self worth." "In the [c]linical or more current and dynamic domain of risk assessment, [defendant] demonstrated some limitations regarding his insight. . . . [H]e has developed insight into his early failure to internalize ethical standards or behavior and into his substance abuse. He had less insight into the loss of control of his aggressive impulses and anger that resulted in his stabbing two victims. He also has limited insight into his failure to develop empathy for others as a youth. His strengths include an absence of current negative attitudes or any symptoms of mental illness. He also has a history of substantial impulse control as indicated by his receipt of

7

no [rule violation reports] during the past 22 years of incarceration. He additionally has been able to display significant benefits from his participation in available programming resources, including his college education and his development of chemical dependency counseling skills."

Overall, it was the psychologist's opinion that defendant "presents a low risk for violence in the free community."

F

*The Parole Board's December 2010 Hearing And Decision*

At the parole board hearing, defendant was asked about several aspects of the psychologist's report. He was asked whether there were components of his past that he understands now that were not reflected in the psychologist's report. Defendant stated the other factors contributing to the commitment offense were "anger, guilt, shame, low self-esteem." He experimented with drugs at an early age as a "form of self medicating" "to sort of escape reality." His father abandoned him when he was young and his parents divorced because his father physically abused his mother, which is something defendant witnessed. His father physically abused him, too, and a lot of defendant's anger "stemmed from that" as well as the fact that his "mother was forced to go to work and fend for the rest of her children, which was eight of [them]," which "left [them] alone." He was unable to show emotions, weakness, or fear, or walk away from challenging situations because he grew up in a "machismo" culture. He "felt less than others as a child" because he did not have a family unit or "good things to go to school with, [like] clothing." He did not have coping mechanisms, so he found ways to escape, including turning to drugs and alcohol. He later realized he had adopted a "false identity." Since then, he has developed "coping skills, tools" to deal with difficult situations, such as identifying situations that make him angry, taking a timeout from them or meditating, or deescalating situations by surrendering.

Defendant was also asked whether the statement in the psychologist's report that "the interview and the review of the records indicated an absence of significant feelings of guilt" was accurate. Defendant responded as follows: "No. I certainly feel guilty for what I've done. I don't know why he would have [] stated that in that manner. But I definitely do feel guilt. There's [*sic*] no words to describe how I feel about it. It's difficult. I fully take responsibility for what I did. Again I had no right. I had absolutely no right to kill Terry McFarland. You know, he didn't deserve to die and I brought that upon him, and I can never give that back. I can never change what happened. And so it's something I got to live with for the rest of my life, knowing that I took another human being's life and affected many other people in the process. You know, I have to look forward and try to make amends with myself and with the people I've hurt and make things better from now on. That's all I have to say." Defendant's attorney then asked the record to reflect that defendant "appeared to get somewhat emotional when answering that question."

Defendant was also asked about stealing the two pounds of pinto beans in 2010. Defendant said he was "going to eat them eventually." He continued: "I had no right to take the food out of the kitchen. It wasn't mine in the first place. It was given to me. But, nevertheless, I made the decision to take it out." "I was questioned what I had. I showed him, and he wrote me up. I took full responsibility for it. Then he made me pay for it." "I compromised my integrity. I should have known better." When the beans were given to defendant, he knew that they had been stolen.

The Board first announced that it had concluded defendant was "not suitable for parole because [he] currently posed[d] an unreasonable risk of danger if released from prison." It then specified, confusingly, as follows: "The first consideration which does weigh against suitability today is the commitment offense, and the Panel feels there is an adequate nexus between the commitment offense and your current risk of danger based on the fact that this is a crime that has never been considered by a previous Panel." After

9

a short discussion of the circumstances surrounding the commitment offense, the Board briefly addressed defendant's social history, noting only that "there were problematic relationships between [him] and principally [his] father"; defendant began using drugs and alcohol at a young age, around eight or nine years old; and he was a high school dropout.

The Board then addressed defendant's "past and present mental state and past and present attitude toward the crime." It expressed "concern" that because defendant referred to protecting himself and his brother in the interview with the psychologist, defendant had not "come to the full responsibility" for his offense. It added that defendant had not said he was "sorry." It also observed that defendant had "noted that the substance abuse impaired [his] judgment and contributed to [his] highly impulsive decision to attempt to steal a car . . . and that the offense would have never occurred if you were clean and sober. . . . That does to a degree fly in the face because there was an opportunity of intervention by [his] brother but yet still [defendant's] actions prevailed." The Board noted that the psychologist's report opined defendant had less insight into the loss of control of his aggressive impulses and anger that resulted in the stabbing of the two victims and that he had limited insight into his failure to develop empathy for others as a youth. The Board did not articulate any conclusion from this observation, but instead went on to discuss the report's finding of low risk for violence.

Finally, the Board considered defendant's "misconduct while incarcerated, three 128's, the last being . . . February 11, [2010], and that was for the possession of stolen foods. And basically the Panel concluded that while that is a counseling chrono that it does represent a lapse of judgment placing your needs and desires above the institution's rules."

At the end of the hearing, the Board stated, after "weighing all of the evidence presented today, you're unsuitable [for] parole because you pose a current and unreasonable risk of danger and require at least an additional five years of incarceration."

G

*Proceedings Following The Board's Decision,*

*Including The Trial Court's Grant Of Defendant's Habeas Petition*

Defendant filed a petition for writ of habeas corpus in the trial court challenging the Board's decision to deny parole. In a 23-page decision filed in June 2012, the trial court granted the petition. The court explained the Board's decision was not supported by any evidence that had a rational nexus to current dangerousness. The trial court set aside the Board's decision and directed it to hold a new parole suitability hearing in accordance with due process of law.

The People appealed to this court. After the trial court denied the People's request for a stay, the People filed a petition for writ of supersedeas seeking to stay enforcement of the trial court's order pending appeal. This court denied the petition.

On appeal from the trial court's decision granting defendant's petition for writ of habeas corpus, the People contend the trial court erred because there was some evidence to support the Board's conclusion that defendant remains a current threat to public safety.

DISCUSSION

I

*Law Governing Parole Decisions, Appellate Standard Of Review, And Mootness*

"The granting of parole is an essential part of our criminal justice system and is intended to assist those convicted of crime to integrate into society as constructive individuals *as soon as possible* and alleviate the cost of maintaining them in custodial facilities. [Citations.] Release on parole is said to be the rule, rather than the exception . . . ." (*In re Vasquez* (2009) 170 Cal.App.4th 370, 379-380.)

In determining whether to grant parole, the Board considers a number of different factors, such as the nature of the offense and defendant's behavior before, during, and after the crime, defendant's mental state, criminal record, social history, attitude toward the crime, and parole plans. (Cal. Code Regs., tit. 15, § 2402.) "It is not the existence or

nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1212 (*Lawrence*); see also *In re Shaputis* (2008) 44 Cal.4th 1241, 1254-1258 (*Shaputis I*).) Succinctly put, "[t]he essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety." (*In re Shaputis* (2011) 53 Cal.4th 192, 220 (*Shaputis II*).)

"Judicial review is conducted under the highly deferential 'some evidence' standard. The executive decision of the Board or the Governor is upheld unless it is arbitrary or procedurally flawed. The court reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision." "The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness. The court is not empowered to reweigh the evidence." (*Shaputis II*, *supra*, 53 Cal.4th at p. 221.)

Here, we review the decision of a trial court granting a petition for writ of habeas corpus. The trial court's decision was based solely on the documentary evidence considered by the Board. We review such decision de novo. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677; *In re Collins* (2001) 86 Cal.App.4th 1176, 1181.)

Where the determinations made by the trial court will govern defendant's future parole suitability hearings, the issues presented in an appeal are not moot even if a defendant has received his subsequent parole suitability hearing. (*In re Montgomery* (2012) 208 Cal.App.4th 149, 160.)

12

## II

*The Factors Cited By The Board Were Either Unsupported By The Evidence*

*Or Did Not Present A Rational Nexus To Current Dangerousness*

The People contend the trial court erred in granting defendant's habeas petition because the Board's decision was supported by some evidence that defendant was currently dangerous. The People's contention of some evidence focuses on the following areas of unsuitability noted by the Board:  1) the facts of the commitment offense; 2) defendant's mental state and attitude, specifically arguing that defendant failed to accept full responsibility for the murder and he lacked insight into his criminality because he never apologized for his actions and had only moderate insight into his antisocial thinking and criminality; and 3) defendant received a custodial counseling chrono in 2010 for possessing stolen food.

The People conclude their argument by explaining why they believe these factors supported a finding of current dangerousness. "Here, the Board articulated that there were multiple concerns that warranted further introspection by [defendant]. When all the concerns raised by the Board and noted in the psychologist's report are coupled with the atrocious nature of the crime, the Board reasonably concluded that [defendant] remained a current danger. Therefore, the reasoning for the Board's conclusion was explained in its decision and a rational nexus existed."

We address the People's argument by looking at each of the factors the Board stated it had considered in finding defendant currently dangerous, as the People have not suggested (and we have not found) that there is anything else in the record that demonstrates a rational nexus between the evidence and the ultimate determination of current dangerousness. As will be seen, the factors cited by the Board are either not present in the record or do not present a rational nexus to current dangerousness.

13

## A

### *The Commitment Offense*

The first consideration the Board found against defendant's suitability for parole was the commitment offense. The Board put it this way: "[T]he Panel feels there is an adequate nexus between the commitment offense and your current risk of danger based on the fact that this is a crime that has never been considered by a previous Panel." The Board then went on to note the crime was "committed in an especially atrocious and cruel manner"; there were multiple victims; a knife was used indicating a more personal form of violence than using a gun; the motive was very trivial; and defendant involved his younger brother, who unsuccessfully tried to dissuade defendant from committing the car theft.

We need not discuss whether we agree with the Board's characterization of the crime because immutable facts such as the commitment offense may serve as the basis for a parole denial "*only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety." (*Lawrence*, *supra*, 44 Cal.4th at p. 1221.) Here, the Board stated the nexus was, "this is a crime that has never been considered by a previous Panel." As the trial court aptly put it, "the Board's best attempt at stating a rational nexus was unreasonable." Indeed, we are unable to glean what the Board meant by this statement. It is noteworthy, however, that in articulating its decision to deny defendant parole, the Board stated this was its first consideration and mentioned this consideration as the only nexus to current dangerousness. While we are aware that "nothing in the requirement that a parole denial be accompanied by a 'statement of . . . reasons' demands that the parole authority comprehensively marshal the evidentiary support for its reasons," (*Shaputis II*, *supra*, 53 Cal.4th at p. 214, fn. 11) our inability coupled with the trial court's inability to make sense out of the Board's stated reason for the nexus support our conclusion that the Board's reliance on the commitment offense to deny defendant parole was arbitrary.

14

The People never adequately articulate the nexus in their briefs either, although they seem to suggest that because defendant has not served his base term of 36 years, it was reasonable for the Board to rely on what it perceived was the aggravated nature of the commitment offense. To support their position, they cite *Lawrence*. *Lawrence* does not support the People's position.

In *Lawrence*, the court stated as follows: "[T]he statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder means that, *particularly* after these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness." (*Lawrence*, *supra*, 44 Cal.4th at p. 1211, italics added.) This passage does not state that the commitment offense can justify denying parole until after the defendant has served the base term of that the commitment offense. To the contrary, the statutory mandate is that "[r]elease on parole is said to be the rule, rather than the exception [citations] and the Board is required to set a release date unless it determines that 'the gravity of the current convicted offense . . . is such that consideration of the public safety requires a more lengthy period of incarceration . . . .' " (*In re Vasquez*, *supra*, 170 Cal.App.4th at pp. 379-380, citing Pen. Code, § 3041, subd. (b).)

Here, we find no rational nexus between the commitment offense and the ultimate determination that defendant is currently dangerous. In stating that the commitment offense weighed against parole suitability, the Board noted the crime was "committed in an especially atrocious and cruel manner"; there were multiple victims; a knife was used indicating a more personal form of violence than using a gun; the motive was very trivial; and defendant involved his younger brother, who tried to dissuade defendant from committing the car theft. Accepting these characterizations as true does not establish the requisite nexus to current dangerousness. For the entire 22 years following the commitment offense, defendant has not engaged in violent acts, has not displayed any

15

tendencies suggesting he cannot control his aggressive or angry impulses, has not possessed any weapons, and has remained drug and alcohol free. On this record, the commitment offense does not support the ultimate determination that defendant is currently dangerous.

B

*Defendant's Unstable Social History*

The second consideration the board found against defendant's parole suitability was his social history, noting "there were problematic relationships between [him] and principally [his] father"; defendant began using drugs and alcohol at a young age, around eight or nine years old; and he was a high school dropout.

This consideration need not detain us long, as even the People make no attempt to justify why defendant's unstable social history has a rational nexus to current dangerousness. Defendant's father is dead, and defendant maintains positive relationships with his siblings. Defendant did not use drugs or alcohol in prison. To the contrary, defendant attended addiction recovery counseling, eventually becoming a counselor in the program. Finally, in prison defendant has completed his GED, received his high school diploma, was five classes away from receiving his associate of arts degree, and "had worked or attended vocational training during most of his incarceration."

Based on the lack of any nexus between defendant's prior unstable social history and his current dangerousness, the Board's reliance on defendant's unstable social history was unsupported.

C

*Defendant's Mental State and Attitude*

The Board next addressed what it referred to as defendant's "past and present mental state" and "past and present attitude toward the crime." First commenting on what it characterized as defendant's failure to accept "full responsibility" for the life

16

crime, the Board opined that defendant was "still blaming others" because he "placed this almost in a mode of self-defense." Defendant also "noted that the substance abuse impaired [his] judgment and contributed to [his] highly impulsive decision to attempt to steal a car . . . and that the offense would have never occurred if [he] were clean and sober . . . . That does to a degree fly in the face because there was an opportunity of intervention by [his] brother but yet [defendant's] actions still prevailed." The Board next observed that the psychologist had noted defendant had less insight into the loss of control of his aggressive impulses and anger that resulted in the stabbing of the two victims, and that he had limited insight into his failure to develop empathy for others as a youth. We discuss each of these factors below.

1

*Self-Defense*

The Board stated defendant was "still blaming others" because he "placed this almost in a mode of self-defense." As we explain, the Board was wrong factually: defendant did not *continue to* believe that self-defense justified the stabbing. Therefore, the Board's implicit finding of current dangerousness based on defendant continuing to assert self-defense was a non-starter.

In a section entitled "life crime," the psychologist reported that defendant's version of the life crime was that he was "scared" and "did what [he] felt [he] had to do to protect [his] brother and [him]self." In a section entitled "remorse and insight into the life crime," the psychologist reported that "during the current interview," defendant "acknowledged responsibility for the offense." In a section entitled "role that alcohol/drugs played in the commitment offense and inmate's ability to refrain from future use in the free community," defendant explained that his decision to pull out his knife at the time of the offense was impulsive and was associated with his significant intoxication. He observed that his use of cannabis additionally reduced his ability to think clearly and prevented him from considering the consequences of his decisions.

17

Clearly when defendant discussed the motivation for his crime and characterized it as doing what he felt he had to do for self-protection and protection of his brother, he was discussing how he felt *at the time of the crime*. He felt the killing was necessary at the time he killed. There was nothing in the psychologist's report stating that defendant continues to believe he needed to stab the victims to defend himself or his brother. Defendant's understanding of his motivation, albeit misplaced motivation, at the time of the crime shows insight, not "blaming others." Importantly, after recounting defendant's version of the crime, the psychologist noted, "[t]here were no significant discrepancies between [defendant's] version of the crime and what was found in the Probation Officer's Report." Finally, at the parole board hearing, defendant stated the following about the commitment offense: "My thoughts about it now is that I had no right to do what I did . . . . There's no excuse, no justifications for any of my actions. It was wrong on so many levels." No evidence exists in this record that supports the Board's mistaken observation which resulted from its apparent misread of a small section of the psychologist's report, as we have detailed above.

On this record, there was no factual support for the Board's assertion that defendant was "still blaming others" by relying on self-defense.[1]

---

[1]     Because there was no factual support for the Board's assertion that defendant was still blaming others by relying on self-defense, we need not address the applicability of *In re Palermo* (2009) 171 Cal.App.4th 1096. There, this court held "there [wa]s no evidence to support the Board's finding that [defendant] poses a danger to public safety if released on parole," where the "defendant's version of the shooting of the victim was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational," and, among other things, "he has expressed remorse and accepted full responsibility for the killing, albeit believing he is guilty only of manslaughter." (*Id*. at p. 1112.) On appeal, the People and defendant dispute whether *Palermo* remains good law.

18

## 2

*Failure To Say, "I'm Sorry"*

The Board next noted defendant's lack of remorse, based first on his failure to say, "I'm sorry." The Board put it this way: "While remorse is noted in the psych [report], the Panel went through the record in great detail today and the simple gesture of saying you're sorry doesn't appear to have occurred."

The record showed the following with respect to defendant's remorse. In a section entitled "remorse and insight into the life crime," the psychologist stated the following, "The C-file records indicate that [defendant] has acknowledged responsibility for the offense and has expressed remorse for the victims and their families since his arrest. He also acknowledged responsibility for the offense during the current interview. He expressed remorse for killing the victim and for the serious injuries to the second victim. He noted that he hurt many people and that the victim's family suffered tremendously." In a section entitled "the prisoner's violence potential in the free community," the psychologist's report stated the following: "Although he has expressed remorse for the murder of the victim, the interview and the review of the records indicated an absence of significant feelings of guilt."

At the parole board hearing, defendant was asked whether the last statement in the psychologist's report was accurate. He responded as follows: "No. I certainly feel guilty for what I've done. I don't know why he would have stated that in that manner. But I definitely do feel guilt. There's no words to describe how I feel about it. It's difficult. I fully take responsibility for what I did. Again I had no right. I had absolutely no right to kill Terry McFarland. You know, he didn't deserve to die and I brought that upon him, and I can never give that back. I can never change what happened. And so it's something I got to live with for the rest of my life, knowing that I took another human being's life and affected many other people in the process. You know, I have to look forward and try to make amends with myself and with the people I've hurt and make

19

things better from now on.  That's all I have to say."  Defendant's attorney then asked the record to reflect that defendant "appeared to get somewhat emotional when answering that question."

The Board's reliance on defendant's failure to say "I'm sorry" was arbitrary.  The California Supreme Court has stated "that expressions of insight and remorse will vary from prisoner to prisoner and that there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior."  (*Shaputis I*, *supra*, 44 Cal.4th at p. 1260, fn. 18.)

The People now seem to suggest that the Board's reliance on defendant's failure to say "I'm sorry" was taken out of context and the Board was "not concerned with hearing an explicit apology."  This argument ignores the record.  After the Board noted for the first time its issue with defendant's lack of remorse stemmed from his failure to say "I'm sorry," the Board noted that the psychologist had also "noted the issue of the remorse" and the Board again said "we spoke with you about the simple gesture."  Then, following the Board's decision, one of the deputy commissioners again emphasized the need to make an explicit apology:  "As you made your closing statement, I just sat here and I just knew you were going to say you were sorry, and I just needed that."

On this record, there was no evidentiary support for the Board's finding that defendant lacked remorse for the commitment offense simply because he failed to use the words, "I'm sorry."

3

*Substance Abuse*

The Board found that defendant's explanation for the role substance abuse played in stealing the car was a factor weighing against defendant's parole suitability.  The Board explained as follows:  defendant "noted that the substance abuse impaired [his] judgment and contributed to [his] highly impulsive decision to attempt to steal a car . . .

20

and that the offense would have never occurred if you were clean and sober . . . . That does to a degree fly in the face because there was an opportunity of intervention by [his] brother but yet [defendant's] actions still prevailed." As we explain, the Board was wrong factually: defendant explained his decision to steal the car was based on more than just his intoxication.

The evidence showed the following with respect to defendant's decision to steal the car. According to the psychologist's report, defendant "described himself as failing to internalize the correct values at that time, which enabled him to make the decision to steal a car on the evening of the offense. He added that he was engaging in criminal thinking and addictive thinking when he made that decision." "He noted that [alcohol and marijuana] impaired his judgment and contributed to his highly impulsive decision to attempt to steal a car. . . . [H]e and his brother had never stolen a vehicle prior to that time, and they had no knowledge regarding how to hot wire the car after they broke into it . . . [T]he offense never would have happened if he was clean and sober since clear thinking would have led him to conclude that he did not know how to steal a car." "He explained that his decisions to steal a car . . . w[as] impulsive and w[as] associated with his significant intoxication. He observed that his use of cannabis additionally reduced his ability to think clearly and prevented him from considering the consequences of his decisions. He noted that his intoxication on cannabis also contributed to his decision to attempt to steal a car despite his lack of any knowledge of how to start a vehicle without a key."

This evidence showed defendant believed he decided to steal the car for three reasons: "failing to internalize the correct values," "criminal thinking and addictive thinking." Thus, the Board was wrong that defendant blamed his decision to steal the car, which included his failure to heed to his brother's plea " 'let's not do it,' " on only his intoxication. On this record, there was no factual support for the Board's assertion that

21

defendant's thought process about stealing the car was somehow deficient because he placed the blame only on his intoxication. The Board erred in relying on this factor.

4

*Less Insight And Limited Insight*

The Board found that the psychologist's observation that defendant had less insight into the loss of control of his aggressive impulses and anger that resulting in the stabbing of the two victims and that he had limited insight into his failure to develop empathy for others as a youth were factors weighing against defendant's parole suitability. The People consistently characterize this finding as a finding that defendant "lacked insight into his criminality." Although we agree that this is the assumption the Board made from the relevant portion of the psychologist's report, we disagree that the report did, in fact, find a lack or *any* deficiency in defendant's insight.

The notation in the psychologist's report about defendant's lack of sufficient insight was as follows. "The observations from the interview indicated . . . [defendant] had less insight into the loss of control of his aggressive impulses and anger that resulted in his stabbing the two victims. He displayed limited insight into his failure to develop empathy for others a youth."

The problem with the Board's reliance on defendant's lack of sufficient insight is that nowhere does the report conclude that defendant *lacks* or has *insufficient* insight in *any* area. For the Board to rely on a finding from the report where that finding was never actually made was clearly improper. Thus we need not even reach the questions of whether the Board's reliance on this factor was arbitrary or whether the record reflects a nexus to current dangerousness that would provide the required modicum of evidence.

The report concluded that defendant presented a low risk of recidivism, which might increase only if he "resumed the use of alcohol or drugs" or "had difficulty obtaining employment"; his risk would further decrease if he continued to remain clean and sober. Although in and of itself a finding of low risk is not dispositive, the report's

22

conclusion expresses no concern about insight or any area in which insight is lacking. Instead, the report makes clear that defendant *has* developed insight--significant in some areas (abuse of alcohol and marijuana), moderate in others (antisocial thinking and behavior at the time of the commitment offense), "less" as to loss of control, and "limited" in one area (failure to develop empathy as a youth). But nowhere does the report signal that defendant has *insufficient* insight in any area.

Clearly the finding of "limited" insight into defendant's failure to develop empathy as a youth, to the extent that finding is properly construed as "lack" of insight in this area, demonstrates no nexus whatsoever to current dangerousness. Further, the finding of "less" insight into loss of control clearly relates back to the earlier findings of "significant" and "moderate" insight in the other key areas. Defendant had less insight in this area--loss of control--than in the others. Although defendant may have less insight into his loss of control than he has in other areas, the report nowhere opines that his degree of insight into his loss of control is somehow lacking or problematic in any way. Simply put, the report does not conclude defendant lacks insight into his loss of control.

Although our Supreme Court has, on rare occasion, characterized the consideration of whether a prisoner "lacks" insight as the consideration of the prisoner's "degree of insight" (*Shaputis II, supra,* 53 Cal.4th at pp. 217-218), at the same time the court described insight as either "present" or "absent." (*Shaputis II,* at p. 218, citing *In re Lawrence, supra,* 44 Cal.4th at p. 1227 ["the presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety."].) Here, the report expressed that defendant had plenty of insight, albeit perhaps "less" insight in some than in other areas, and nowhere expressed any concern about any of his varying degrees of insight as lacking or problematic. Further, and most importantly, the report found no nexus whatsoever to current dangerousness in any of the degrees of insight it discussed.

We reach this conclusion without having to "reweigh" the evidence; we discuss some of the other evidence contained in the report that consistently signals defendant's suitability for parole only to support our interpretation of the segment of the report at issue (mentioning "less insight") and our resulting conclusion that to construe this segment as a finding that defendant lacks insight or even expressed a problematically low degree of insight in any area would be misinterpreting what the report actually says.

D

*Defendant's Misconduct While Incarcerated*

The final consideration the Board found against defendant's parole suitability was defendant's "misconduct while incarcerated, three 128's,[**2**] the last being . . . February 11, [2010], and that was for the possession of stolen food. And basically the Panel concluded that while that is a counseling chrono that it does represent a lapse of judgment placing your needs and desires above the institution's rules."

The People argue this was a proper factor for the Board to consider because its relevance to whether defendant "could be successful on parole is undeniable." The question, however, is "whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness." (*Shaputis II*, *supra*, 53 Cal.4th at p. 221.) Based on the record, there was no evidence it was.

The People's argument of the relevance of defendant's counseling chronos is based on *In re Reed*, *supra*, 171 Cal.App.4th at page 1071. In *Reed*, the defendant while incarcerated for the life crime had received 11 rule violation reports (violations of law or misconduct that is not minor in nature) and 19 counseling chronos (incidents of minor misconduct). (*Id*. at p. 1077.) The Board relied principally on the defendant's receipt of his last counseling chrono "only because it violated a prior direction of the Board [to

---

**2**     Defendant actually had four counseling chronos.

24

remain discipline free, which he did not do only 60 days after the directive by receiving the counseling chrono], and because . . . petitioner had an extensive history of institutional misconduct. . . . [T]hese facts provide some evidence that petitioner would continue to pose a threat to public safety if released." (*Id*. at p. 1086.)

The *Reed* court contrasted those facts with the facts in *In re Smith* (2003) 109 Cal.App.4th 489, where the Governor reversed the Board's grant of parole to Smith, in part because during his incarceration, Smith received four minor disciplinary reports. (*In re Reed*, *supra*, 171 Cal.App.4th at p. 1086.) "In fact, Smith had received four CDC 128-A's and no CDC 115's in prison, and one of the commissioners at Smith's parole hearing commended him because he had not ' "had any 115's" ' and had been ' "disciplinary-free" ' the entire time." (*Ibid*.) "The appellate court affirmed the trial court's grant of Smith's petition for writ of habeas corpus . . . . '[T]here is no evidence to support the Governor's statement that Smith received four "disciplinary reports" (minor or otherwise) while in prison. [Citation.] In prison argot, "counseling chronos" document "minor misconduct," not discipline, and the evidence is undisputed that Smith has been "disciplinary-free" for the entire period of his incarceration. [Citations.]' " (*Ibid*.)

The same is true here. Defendant has been discipline free for his entire 22 years of incarceration. We fail to see a rational nexus between defendant's minor prison misconduct, the most recent being possessing two pounds of stolen pinto beans in 2010, either by itself or coupled with other evidence in defendant's record, and his current dangerousness. The misconduct was not serious, violent, or dangerous, or part of an extensive history of institutional misconduct. To the contrary, as the psychologist noted, defendant's "overall record . . . is suggestive of a substantial level of impulse control with infrequent lapses that were considered minor. There were no infractions that were associated with an increased risk of violence." Further, the psychologist noted that defendant "presents as being amenable to any recommendations or requirements that may be set forth by the BPH in helping to justify a release to the community on parole." The

psychologist did not find any issue with defendant's impulse control or willingness to follow directions--let alone any nexus to dangerousness--from defendant's receipt of the counseling chrono and no issue is otherwise apparent from the record.

On this record, there was no rational nexus between defendant's prison misconduct and defendant's current dangerousness.

III

*Conclusion And Remedy*

As we have explained above, the factors cited by the Board in support of its decision denying defendant parole were not present in this record or unsupported by the evidence and/or lacked a nexus to defendant's current dangerousness. When the Board's decision is not supported by some evidence of current dangerousness, "the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*In re Rosenkrantz*, *supra*, 29 Cal.4th at p. 658.) This is what the trial court did.

DISPOSITION

The judgment (order granting defendant's writ of habeas corpus) is affirmed.


                    ROBIE          , Acting P. J.



I concur:



      DUARTE      , J.




26

**Mauro, J., dissenting:**

The authority to decide whether to grant parole to an inmate serving an indeterminate sentence is vested in the executive branch of government. (*In re Shaputis* (2011) 53 Cal.4th 192, 198-199 (*Shaputis II*).) The parole authority in California -- the Board of Parole Hearings (Board) and, in certain circumstances, the Governor -- has extremely broad discretion in making parole suitability determinations. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1201-1204 (*Lawrence*).) Although a court, as part of the judicial branch of government, may be called upon to review an executive branch parole suitability determination to ensure that the determination is not arbitrary or capricious (*Shaputis II*, *supra*, 53 Cal.4th at p. 199), the court's review is limited and highly deferential. (*Ibid.*; *Lawrence, supra*, 44 Cal.4th at p. 1204.)

Despite the clear separation of powers established in the law governing parole suitability determinations, with the concomitant requirement for judicial restraint in reviewing such determinations, trial and appellate courts have nonetheless often misunderstood the proper scope of review. (*Shaputis II*, *supra*, 53 Cal.4th at p. 220.) In 2011, the California Supreme Court once again explained the correct standard, reemphasizing the extremely limited and highly deferential role of the courts. (*Shaputis II, supra*, 53 Cal.4th 192.)

I believe the majority in this case has misapplied the standard of review, thereby improperly invading the province of the parole authority. The majority is correct, of course, that there are a number of problems with the Board's explanation for its decision. For example, the fact that this was defendant's first parole hearing is not a basis to find him unsuitable for parole. But the fact that the Board made some misstatements in explaining its decision is not necessarily a basis to reject its determination of unsuitability. As I explain in more detail below, we must engage in a deferential review to see if there is a modicum of evidence in the entire record to support the Board's

1

determination that defendant posed a current threat to public safety at the time of the parole decision.

This record contains some evidence to support the Board's denial of parole.

I

When reviewing a parole unsuitability determination by the Board, a court must consider the entire record in the light most favorable to the Board's decision, to see if the record discloses some evidence -- a modicum of evidence -- supporting the determination that the inmate would pose a danger to the public if released on parole. (*Shaputis II*, *supra*, 53 Cal.4th at p. 214.)

Although the "some evidence" standard is not toothless, it must not operate to impermissibly shift the ultimate discretionary decision of parole suitability from the executive branch to the judicial branch. (*Shaputis II*, *supra*, 53 Cal.4th at p. 215.) The Board's decision is subject to judicial review, but that review is limited and narrower in scope than appellate review of a lower court's judgment. (*Ibid*.) The "some evidence" standard is intended to guard against arbitrary parole decisions without encroaching on the broad authority granted to the Board. (*Ibid*.) The standard is more deferential than substantial evidence review, and may be satisfied by a lesser evidentiary showing. (*Id.* at p. 210.)

In fact, a court may overturn a contrary decision by the Board only when the evidence reflecting the inmate's present risk to public safety *leads to but one conclusion*. (*Shaputis II*, *supra*, 53 Cal.4th at p. 211.)

The court may not substitute its own credibility determination for that of the parole authority. (*Shaputis II*, *supra*, 53 Cal.4th at p. 214.) Resolution of conflicts in the evidence, and the weight to be given the evidence, are matters within the authority of the Board. (*Id.* at p. 210.) Likewise, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Board. (*Ibid*.; Cal. Code Regs., tit. 15, § 2402, subds. (c), (d) [the importance attached to

2

any circumstance tending to show unsuitability or suitability or combination of such circumstances in a particular case is left to the judgment of the panel].) It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. (*Shaputis II*, *supra*, 53 Cal.4th at p. 210.)

Thus, although the evidence supporting a parole unsuitability finding must be probative of the inmate's current dangerousness, it is not for the reviewing court to decide *which* evidence in the record is convincing. (*Shaputis II*, *supra*, 53 Cal.4th at p. 211.) When the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary. (*Id*. at p. 215.) Any relevant evidence that supports the parole authority's determination is sufficient to satisfy the "some evidence" standard. (*Id*. at p. 214.)

A parole suitability decision is an attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts. (*Shaputis II*, *supra*, 53 Cal.4th at p. 219.) Past criminal conduct and current attitudes toward that conduct may both be significant predictors of an inmate's future behavior. (*Ibid*.) While subjective analysis is an inherent aspect of the parole suitability determination, it plays a proper role only in the parole authority's determination. (*Ibid*.) The court's function is one of objective review, limited to ensuring that the Board's analysis of the public safety risk is based on a modicum of evidence, not mere guesswork. (*Ibid*.)

Accordingly, the reviewing court does not ask whether the inmate is currently dangerous. (*Shaputis II*, *supra*, 53 Cal.4th at p. 221.) That question is reserved for the executive branch. (*Ibid*.) Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness. (*Ibid*.)

But nothing in the requirement that a parole denial be accompanied by a statement of reasons demands that the parole authority comprehensively marshal the evidentiary support for its reasons. (*Shaputis II*, *supra*, 53 Cal.4th at p. 214, fn. 11.) Appellate review for some evidence supporting the parole authority's decision extends to the entire record, and is not limited to the evidence specified by the parole authority. (*Ibid*.)

## II

Applying the foregoing standard to the record in this case, and viewing the record in the light most favorable to the Board's decision, there is some evidence to support the Board's decision to deny parole.

## A

In the May 2010 psychological report, the psychologist expressly stated that defendant demonstrated some limitations regarding his insight, had less insight into the loss of control of his aggressive impulses and anger that resulted in his stabbing the two victims, and displayed limited insight into his failure as a youth to develop empathy for others. The psychologist's statements were based on observations from his interview with defendant. The Board referenced those statements in its decision. But despite those express statements in the psychological report, the majority now asserts -- without citation to authority -- that it was improper for the Board to rely on those statements because the psychologist did not ultimately "conclude" that defendant had insufficient insight. (Maj. opn., p. 23.)

The majority further asserts that the psychologist's statements regarding "limited" or "less" insight in certain areas "clearly" relate back to the psychologist's findings of "significant" and "moderate" insight in other areas. (Maj. opn., p. 23.) The majority explains: "Although defendant may have less insight into his loss of control than he has in other areas, the report nowhere opines that his degree of insight into his loss of control is somehow lacking or problematic in any way. Simply put, the report does not conclude defendant lacks insight into his loss of control." (Maj. opn., p. 23.)

4

The majority's holdings in this regard incorrectly suggest that the Board lacks discretion to consider individual statements contained in the psychological report, and that the Board is instead bound by the psychologist's ultimate conclusions. There is no authority for such a holding. (See generally *Shaputis II*, *supra*, 53 Cal.4th at pp. 207-208, 212-213 [Board can reject psychologist's conclusions].)

The law is clear that it is not for the reviewing court to decide which evidence in the record is convincing. (*Shaputis II*, *supra*, 53 Cal.4th at p. 211.) The weight to be given the evidence is a matter within the authority of the Board. (*Id.* at p. 210.) Any relevant evidence that supports the parole authority's determination is sufficient to satisfy the "some evidence" standard. (*Id*. at p. 214.)

Relying on statements by the California Supreme Court describing a defendant's insight as either "present" or "absent," the majority concludes that because defendant's insight is described as "less" or "limited" -- and not completely absent -- there is no evidence to support the Board's decision. (Maj. opn., p. 23.) The majority's discussion suggests that as long as a defendant has some *minimal* understanding of his criminal behavior, however deficient that understanding might be, the Board lacks the discretion to consider defendant's limited understanding in making its suitability determination. Such a result is untenable. In making its subjective suitability determination, the parole authority must have the discretion to consider a defendant's limited understanding of his crime and the ways in which he could avoid future antisocial acts if released on parole. (*Shaputis II, supra*, 53 Cal.4th at pp. 217-218 [the inmate's "degree of insight" into his or her criminal behavior is a factor in parole suitability determinations]; *In re Shaputis* (2008) 44 Cal.4th 1241, 1251, 1253, 1260-1261 (*Shaputis I*) [upholding the Governor's decision to deny parole based in part on the inmate's lack of sufficient insight concerning his conduct toward the victim in a case where the most recent psychologist's report noted that the inmate had "limited insight" into his antisocial behavior and the connection between his alcohol abuse and his violent acts].)

5

The majority adds, again without citation to authority, that, "most importantly, the [psychological] report found no nexus whatsoever to current dangerousness in any of the degrees of insight it discussed." (Maj. opn., p. 23.)  This suggests a court may reverse a Board decision any time a *psychologist* fails to specify the nexus to current dangerousness.  But that is not the law.  Appellate review for some evidence supporting the parole authority's decision extends to the entire record and is not limited to specified evidence.  (*Shaputis II*, *supra*, 53 Cal.4th at p. 214, fn. 11.)

Here, the psychologist said defendant had less insight into the loss of control of his aggressive impulses and anger that resulted in his stabbing the two victims.  If defendant has less understanding into why he lost control of his aggressive impulses and anger, then he may not be able to prevent a loss of control in the future if released on parole.  (*Shaputis II*, *supra*, 53 Cal.4th at pp. 219-220.)  The evidence of "limited" or "less" insight has a nexus to current dangerousness, and thus supports the Board's decision to deny parole.

B

There is also some evidence in the record that defendant has not accepted responsibility for his crime; such evidence further supports the Board's determination of current dangerousness.  The May 2010 psychological report said that although defendant "has expressed remorse for the murder of the victim, the interview and the review of the records indicated an absence of significant feelings of guilt."  In addition, the psychologist said there was evidence that defendant failed to accept responsibility for his actions.  In discussing the murder with the psychologist during the 2010 interview, defendant emphasized that one of the victims had a bat, that defendant had been hit on the head and arm by the bat, "[i]t was three of them and two of us" and defendant pulled out his knife and did what he felt he needed to do to protect his brother and himself.

But there is evidence in the record that defendant began to physically engage with McFarland (the murder victim), and pulled a knife on McFarland before McFarland

6

obtained the bat. There is evidence that McFarland held the bat in a batter's stance and repeatedly asked defendant to drop the knife, but defendant instead lunged at McFarland, fatally stabbing him. It was only then that the other victim, Fitzgerald, grabbed the bat and hit defendant with it, yelling "drop the knife." Comparing this evidence with defendant's statements to the psychologist, there is some evidence to support the conclusion that defendant has not accepted responsibility for the murder. The Board also expressly noted that defendant continued to make inconsistent statements.

The majority concludes there was no factual support for the Board's assertion that defendant was "still blaming others" by relying on self-defense. (Maj. opn., p. 18.) But as I have explained, there was some evidence to support the Board's conclusion that defendant has not accepted responsibility.

In addition, the majority points to the portion of the psychological report indicating that defendant acknowledged responsibility for the commitment offense during the 2010 interview. (Maj. opn., p. 19.) It is for the parole authority, however, to resolve conflicts in the evidence; we cannot disturb the parole authority's resolution of contradictory statements in the psychologist's report. (*Shaputis II*, *supra*, 53 Cal.4th at p. 214.) The Board was not required to accept every statement made by defendant or the psychologist, and we cannot give certain statements credence if the Board did not. (*Id.* at pp. 214-215.)

Viewed in the light most favorable to the Board's decision, there is evidence in the record to support a conclusion that defendant has not accepted responsibility for his crime. And it was within the Board's discretion to conclude that if defendant lacks a sense of responsibility or guilt regarding the murder, he may not act differently if confronted with a similar situation in the future. (*Shaputis I, supra*, 44 Cal.4th at p. 1261, fn. 20.) There is a nexus between defendant's failure to accept responsibility and current dangerousness.

7

## C

Defendant knowingly received stolen property in prison in 2010, the year the Board issued its decision. The Board indicated that the incident involved defendant placing his needs and desires above the rules.

The majority notes that the incident involved the possession of two pounds of stolen pinto beans, describes it as minor prison misconduct, points out that defendant was not disciplined for the incident, and concludes there is no nexus to current dangerousness because the conduct was not serious, violent, dangerous, or part of an extensive history of institutional misconduct. (Maj. opn., p. 25.)

However, as the Court of Appeal explained in *In re Reed* (2009) 171 Cal.App.4th 1071, although the applicable regulations identify " 'serious misconduct' " as an unsuitability factor, the circumstances listed are merely general guidelines, and the importance attached to any circumstance is left to the judgment of the Board. (*Id.* at pp. 1080-1081.) Among the factors the Board considers in determining the risk to public safety is the inmate's likely behavior following confinement. (*Id.* at p. 1081.) Denial of parole is appropriate when there is an unreasonable risk the defendant, if paroled, will commit antisocial acts. (*Ibid.*) Antisocial acts include crimes of violence, but they also include personal or financial harm to others. (*Ibid.*) Thus, the Board may consider defendant's prior record of property crimes when making its suitability determination. (*Ibid.*)

In addition, the Board may consider a prison counseling chrono (CDCR form 128-A). (*In re Reed, supra*, 171 Cal.App.4th at p. 1084.) Nothing in the law precludes consideration of a prisoner's minor institutional misconduct in determining parole suitability. (*Ibid.*)

Defendant's recent and knowing receipt of stolen property is rationally related to whether he will be able to live in society without committing additional antisocial acts. His conduct may be a significant predictor of his future behavior. (*Shaputis II, supra*,

8

53 Cal.4th at p. 219 [antisocial behavior is a proper parole suitability consideration].)  It is not for us to decide whether defendant is currently dangerous; that question is reserved for the executive branch.  (*Shaputis II, supra*, 53 Cal.4th at p. 221.)  The evidence of defendant's recent misconduct in prison supports the Board's decision to deny parole.

Under the circumstances, I would reverse the judgment (the order granting defendant's petition for writ of habeas corpus).


                                                                        _____MAURO_____, J.